UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAG4, LLC, | ) | |
| | ) | |
| TITSWORTH PROPERTIES, LLC, | ) | |
| | ) | |
| UNIFIED COLLECTIVE URBAN | ) | |
| REDEVELOPMENT GROUP, LLC, | ) | |
| | ) | |
| JASON LeROY STATEN, | ) | |
| | ) | |
| ANTHONY PITALE AND VERONICA ERB, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF ST. LOUIS, | ) | |
| | ) | |
| EX-MAYOR TISHAURA JONES, | ) | |
|     in her official and individual capacities | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| EX-BUILDING COMMISSIONER | ) | |
|    FRANK OSWALD | ) | |
|     in his official and individual capacities | ) | |
| | ) | |
| BUILDING COMMISSIONER ED WARE, | ) | |
|     in his official and individual capacities | ) | |
| | ) | |
| BLD. INS. JOHN WATSON, | ) | |
|     in his individual capacity only, | ) | |
| | ) | |
| BLD. INS. ADEBANJO "BANJO" POPOOLA, | ) | |
|     in his individual capacity only, | ) | |
| | ) | |
| MAXIFY CONTRACTORS, LLC, | ) | |
| | ) | |
| IFEANYI ARINZE, | ) | |
| | ) | |
| BLD. INS. ANTHONY MORROW, | ) | |
|     in his individual capacity only, | ) | |
| | ) | |
| BLD. INS. SCOTT LIND, | ) | |
|     in his individual capacity only, | ) | |

1

|                                           |     |
|-------------------------------------------|-----|
| FARST CONSTRUCTION                        | )   |
|     LIMITED LIABILITY COMPANY,            | )   |
|                                           | )   |
|         Defendants.                       | )   |

### COMPLAINT, 42 U.S.C. 1983
### CIVIL CONSPIRACY, FOURTH AMENDMENT SEIZURE,
### FOURTEENTH AMENDMENT DENIAL OF PROCEDURAL DUE PROCESS

JAG4, LLC, Titsworth Properties, LLC, Unified Collective Urban Redevelopment Group, LLC, Jason LeRoy Staten, and Anthony Pitale and Veronica Erb, by counsel W. Bevis Schock and Erich Vieth, state for their Complaint against the City of St. Louis, Ex-Mayor Tishaura Jones, Ex-Building Commissioner Frank Oswald, Building Commissioner Ed Ware, Building Inspector John Watson, Building Inspector Adebanjo "Banjo" Popola, Maxify Contractors, LLC, Ifeanyi Arinze, Building Inspector Anthony Morrow, Building Inspector Scott Lind, and Farst Construction Limited Liability Company under the Civil Rights Act, 42 U.S.C. 1983 and 1988 for Violation of Substantive Due Process, Civil Conspiracy to Violate Civil Rights, Fourth Amendment Seizure, Fourteenth Amendment Denial of Procedural Due Process, and *Monell* liability:

### INTRODUCTION

1.    Plaintiffs are City property owners who have been subject to the "Preserve and Rehabilitate Program."  The City unilaterally hires construction crews to perform alleged repairs on a property, bills the owners for the costs, and then places a tax lien on the property for those bills.  Many parts of the bills are non-sensical, for example, tuckpointing on a brick-less building, and stair repair on a one-story building.  Further, the work is shoddy, for example, roof joints are not plumb.  The tax liens are a slander of title.  Discovery is likely to show kickbacks.

## JURISDICTION AND VENUE

1.  Plaintiff brings this case pursuant to the Civil Rights Act, 42 U.S.C. §§ 1983 and 1988, and the Fourth and Fourteenth Amendments to the United States Constitution.

2.  This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

3.  Venue is proper in this Court under 28 U.S.C. § 1391 because the relevant events occurred within the City of St. Louis, Missouri, which is within the Eastern Division of this Court.

## COLOR OF STATE LAW

4.  At all relevant times, all Defendants acted under color of state law.  Particularly, at all relevant times, all Defendants acted under the color of the laws, statutes, ordinances, regulations, policies, customs and usages of the State of Missouri.

5.  The private actor Defendants acted in concert with the public officials and are therefore liable under 42 U.S.C. 1983.[1]

## JURY DEMAND

6.  Plaintiffs demand a jury trial on all factual issues, including damages.

## PARTIES

### Plaintiffs

7.  Plaintiff JAG4, LLC is a Missouri limited liability company in good standing.  JAG4 owns the land and building at 8029 North Broadway, St. Louis, MO  63147, within the City of St. Louis.  Robert Miner is the only member and the sole owner of JAG4.

8.  Plaintiff Titsworth Properties, LLC is a Missouri limited liability company in good standing.  Titsworth Properties owns the land and buildings at 4831-4837 Fountain and

---

[1] Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970).

1106-1109 Bayard, St. Louis, MO 63113, (two buildings on a corner with party walls), within the City of St. Louis. Aloysius Titsworth is the only member and the sole owner of Titsworth Properties.

9.    Plaintiff Unified Collective Urban Redevelopment Group, LLC is a Missouri limited liability company in good standing. Unified owns the land and building at 1417 Angelica Street, St. Louis, MO 63107, within the City of St. Louis. Latonda Nanese Moody is the only member and the sole owner of Unified.

10.    Plaintiff Jason Staten is an individual residing in the City of St. Louis. Staten owns the land and building at 4809-4811 Fountain, St. Louis, MO 63113, within the City of St. Louis.

11.    Plaintiffs Anthony Pitale and Veronica Erb are husband and wife residing in the City of St. Louis. Pitale and Erb own the land and building at 774 Hodiamont Ave., St. Louis, MO 63112, within the City of St. Louis.

**Defendants**

12.    City of St. Louis is a lawfully formed and functioning Charter City in the State of Missouri.

13.    Ex-Mayor Tishaura Jones was at all relevant times the duly elected and serving Mayor of the City. Plaintiffs sue Ex-Mayor Jones both in her official capacity and in her individual capacity.

14.    Ex-Building Commissioner Frank Oswald was the Building Commissioner of the City of St. Louis from the beginning of all relevant time until at least February 16, 2024 and perhaps for a few weeks thereafter. Plaintiffs sue Oswald in both his official and his individual capacities.

15.   Building Commissioner Ed Ware has been the Building Commissioner of the City of St. Louis since approximately March 2024.  Plaintiffs sue Ware in both his official and his individual capacities.

16.   John Watson is an employee of the City of St. Louis working as a building inspector. Plaintiffs sue Watson in his individual capacity only.

17.   Adebanjo "Banjo" Popoola, known at all relevant throughout City Hall as "Banjo," (and referred to herein by that name), was at all relevant times an employee of the City of St. Louis working as a building inspector.  He resigned as the events described herein became public.  Plaintiffs sue Banjo in his individual capacity only.

18.   Maxify Contractors, LLC is Missouri limited liability company in good standing.

19.   Ifeanyi Arinze is an individual, and the Registered Agent of Maxify Contractors, LLC.

20.   Anthony Morrow is an employee of the City of St. Louis working as a building inspector. Plaintiffs sue Morrow in his individual capacity only.

21.   Scott Lind is an employee of the City of St. Louis working as a building inspector. Plaintiffs sue Lind in his individual capacity only.

22.   Farst Construction Limited Liability Company is a Missouri limited liability company in good standing.

**ORDINANCE PRESERVE AND REHABILITATE PROGRAM**

23.   On July 18, 2018, the City passed Ordinance 70794, 196 pages long, adopting the International Building Code "with amendments."

24.   That Ordinance is codified Chapter 25 of the City Code.

25.   Section 25.01.010 adopts the international building code.

26.    The next section, 25.01.020, restates all of that building code, but contains amendments.

As to differences between the two Section 25.01.020 trumps Section 25.01.010.

27.    Subsection 119.5 of that amended building code describes the Preserve and Rehabilitate

Program at issue here:

> *119.5 Cost; Method of Payment; Lien; Penalty.* The building official shall have
> the authority to require any violator of this code to correct, remove, or abate any
> condition caused or permitted by them in violation of this code; and the building
> official shall be permitted to correct, remove, or abate the same upon their failure
> to comply with the requirements of this code when the public interest so requires.
> For all emergency condemned buildings or structures, the building official shall
> have the authority to receive and publicly open bids and award the contract to the
> lowest qualified bidder meeting the specifications without first sending said
> contract to the Comptroller. These contracts shall be signed by the Building
> Commissioner and countersigned by the Director of Public Safety and shall have
> the full effect of a City contract. All costs attending such action in such cases shall
> be paid from the appropriate fund as provided in Section 119.3 and then collected
> from the party offending as therein provided. A lien for such costs shall be placed
> against the property whereon such violation was permitted to exist. The cost shall
> also be certified to the Collector of Revenue or other official collecting real estate
> taxes, who shall cause a special tax bill against the property to be prepared and
> collected in the same manner and procedures as other real estate tax bills. Said
> special tax bill shall be deemed a personal debt against the property owner(s) and
> shall also be a lien on the property until paid. These bills or liens shall not be
> forgiven except by the City Counselor, who shall, in writing, instruct the building
> official to forgive such bills or liens. Further, board-up and demolition bills shall
> be permitted to be waived when ownership of said property for which the bill or
> lien was issued is accepted by Land Reutilization Authority, Saint Louis
> Development Corporation, or any other City agency. Any person, firm or
> corporation who shall refuse or neglect to comply with the provisions of this
> section or who shall violate any of the provisions thereof shall be subject to the
> penalties as set forth in Section 25.01.030. In addition, any payments deemed to
> be in arrears shall be subject to interest charges at a rate set by the Comptroller.

## JAG4, LLC

### Background

28.    Plaintiff JAG4 owns the land and commercial building at 8029 North Broadway.  The

building at that location was built in 1865.  The property is commercial and residential,

with two commercial floor front spaces, two apartments, and two garages, one attached

6

and one not attached.

29.     JAG4 purchased the property and building in 2015.

30.     For the next six years JAG4 rented out parts of the building for cash, including the front

        to a retail firm for a storefront and the garages to two tenants using the space for storage.

31.      In approximately 2021 JAG4 gutted out the building's interior.

32.     Before the events described below starting in the fall of 2023, the roof was sound.

33.     Similarly, at all relevant times the walls have never been bulging and at all times the

        building has been structurally sound.

34.     At all relevant times the building has been secure, that is, with locked doors and boarded

        up windows on the first floor.

35.     Since JAG4 gutted the building, it has lacked plumbing, heating, water and electric.

36.     It would take approximately three hundred thousand dollars to fully fix up the building so

        as to make its components economically viable for rental.

37.     At the present time the economy of the neighborhood makes it impossible for such an

        investment in the building to be profitable.

38.     From the time JAG4 bought the building until the work was done which the City required

        JAG4 to do as described below, Mr. Miner, JAG4's owner, used the building for storage

        for JAG4's retail store, "The Soap Shop," which is next-door at 8033 North Broadway.

39.     Mr. Miner is an experienced business person.

### Preserve and Rehabilitate Program

40.     In November of 2023 JAG4 received a "Notice of Condemnation" for the building.  The

        notice was dated November 2, 2023.

41.     The notice was signed by Building Inspector John Watson.

42.   The notice contained a list of deficiencies including: exterior brick walls were bulged, shifted, windows missing, windows open, roof defect, interior structural deteriorated, interior debris, rodents, insects, improperly distributed loads on floors, harbor for vagrants or criminals.

43.   These were called "public safety issues."

44.   Although some windows on the second floor were open, all the other statements on the above list were false.

45.   No one from the City has ever been in the building to determine the condition of the interior.  The only facts about the condition of the building which could have been known at that time by a City inspector such as Watson would have been facts which could have been discerned by an inspector viewing the building from the outside.  Nothing about the interior could have been known.

46.   On March 28, 2024, JAG4 received by mail a notice dated March 15, 2024, from City of St. Louis about work to be done at the building.

47.   The notice included costs for work allegedly needed.

48.   Much of the work was not needed and all of it was overpriced.

49.   The notice stated that JAG4 had a 10-day right to appeal.  It was already on the 8th day of that 10-day time to appeal that he received the letter.

50.   Mr. Miner went directly to City Hall and on behalf of JAG4 filed an appeal.

51.   The Board of Building Appeals held a hearing with Gene Coleman seeming to preside. Others present include but were not limited to were Mr. Miner, Assistant City Counselor Myia S. Wood, Banjo and others.

52.   The transcript of the hearing shows that the matter before the Board was not identified,

there was no indication of whom was present, and there was no statement of the authority of the Board of Building Appeals.

53.    Mr. Coleman, the seeming chair, stated that he was a "volunteer" and "served at the pleasure of the Mayor," [Ex-Mayor Jones].

54.    Someone representing the City stated that the property was part of the Preserve and Rehabilitate Program.

55.    During the hearing a cost of $183,800.00 was mentioned, and Mr. Miner stated that he did not want the work done at that price, not least because he would only have one year to pay it back and the work would not be profitable.

56.    Through an uncertain process and through uncertain authority, the Board of Building Appeals denied the appeal and gave JAG4 two weeks to prepare a schedule for the rehabilitation of the building.

57.    Mr. Miner on behalf of JAG4 promptly prepared a schedule of work and delivered it to Inspector Watson, Banjo, and the Building Division.

58.    Mr. Miner on behalf of JAG4 was terrified that the City would do work at the building and bill him for the mentioned amount of $183,800.00.

59.    Mr. Miner on behalf of JAG4 began doing work at the building which did not require a permit.

60.    That work by JAG4 included tuckpointing work on the side wall by two subcontractors, cleaning out the building, tearing off part of the roof, removing flooring and floor joists, boarding up windows on the second floor, and adding an address to the rear of the building.

61.    JAG4 has had to sell personal property in order to raise funds to do this work.

62.    JAG4 finally ran out of funds with the roof work and other work incomplete.

63.    Included with the Preserve and Rehabilitate Program notice Mr. Miner received a
       Schedule of Work with the itemized prices for the alleged work to be done.

64.    The prices were far above market.

65.    As an example of overpricing, the City's Schedule of Work stated that boarding up nine
       windows would cost $10,500.00.  A fair market price would have been $1,000.00 to
       $2,000.00.

66.    Before the above-described events the building was a useful asset to JAG4.

67.    JAG4 would not have started the work but for the demands of the City.

68.    As a result of the work on the roof, the building is no longer a useful asset to JAG4.

69.    The City never followed up with an inspection.

70.    The City never put a tax lien on the property.

71.    JAG4 has never heard back from the City.

**Damages**

72.    The false statements by the City, and the City notifying JAG4 that the City would do
       work and charge JAG4 was a constitutional insult, particularly,[2]

       a.    Fourth Amendment right to be free of unreasonable seizure,

       b.    Fourteenth Amendment right to procedural due process, and

       c.    Fourteenth Amendment right to substantive due process.

73.    These events caused JAG4 to close The Soap Shop which theretofore had been a
       profitable business.

---

[2] See *Willowby v. City of Philadelphia*, 946 F. Supp. 369, 379 (E.D. Pa. 1996) awarding damages
for constitutional insult.

74.     To survive financially due to the losses incurred and by the reduction at the Soap Shop he had to sell his 1965 Classic Cadillac, his box truck, a cargo van and many other items of personal property.

75.     As a result of the false statements by Watson, the participation of Banjo, the conduct of the Board of Building Appeals allegedly at the pleasure of the Mayor, and therefore the City because the Mayor is the policymaker for the City, JAG4's useful building became an un-useful building.

## TITSWORTH PROPERTIES, LLC

### Background

76.     Plaintiff Titsworth Properties, LLC owns the land and commercial buildings at 4831-4837 Fountain and 1106-1109 Bayard.  That is a corner property consisting of two buildings. The site is four blocks north of Delmar between Walton and Euclid.  The buildings at that location were built many decades ago.

77.     Titsworth Properties purchased the property and buildings in 2006.

78.     At all relevant times the walls have been plumb and at all times the buildings have been structurally sound.

79.     With some exceptions promptly corrected, at all relevant times the buildings have been secure, that is, with locked doors and boarded up windows.

80.     At all relevant times the buildings have lacked plumbing, heating, water and electric.

81.     It would take over a million dollars to fully fix up the buildings so as to make them economically viable for rental, but at the present time the economy of the neighborhood makes it impossible for such an investment to be profitable.

82.     Mr. Titsworth is an experienced real estate developer.

**Preserve and Rehabilitate Program**

83. On Wednesday, January 30, 2019, the City sent Titsworth Properties a notice of condemnation stating that the buildings were unsafe.  The mailing was sent to Mr. Titsworth's address at 4555 Newberry Terrace.

84. The building was not unsafe.

85. The zip code on the letter was wrong, for the zip code on the envelope was 63108, but the correct zip code for that address is 63113.

86. Mr. Titsworth does not recall receiving that notice.

87. On March 13, 2023, four years later, the City sent Titsworth Properties a document titled:

NOTICE OF INTENT TO PRESERVE AND REHABILITATE STRUCTURE

88. The Notice was sent to 4555 Newberry Terrace, St. Louis, MO  63108.  The zip code was again wrong, but, additionally, Mr. Titsworth had sold the Newberry Terrace property on September 23, 2020, which a cursory check of the Assessor's records would have shown.

89. Titsworth Properties did not receive the notice within a few days of the mailing.

90. Titsworth Properties eventually received the notice when he went to City Hall as described below.

91. The Notice referenced the above-described Notification of Condemnation from several years earlier on January 30, 2019.

92. The new Notice stated that it had come to the attention of the City that the property had not been fixed up in the intervening four years.

93. The Notice then said:

Therefore the Building Commissioner plans to have the above-mentioned conditions abated by whatever work deemed necessary to secure public health and

welfare.

94. In approximately February 2023 Mr. Titsworth drove by the building and saw workers doing looking at the building.

95. He spoke to the workers, determined that they had low English language skills, told them to leave, which message they did understand, partially through Mr. Titsworth's gestures, and they did leave.

96. Approximately two weeks later Mr. Titsworth again drove by the building and the workers were back. They were gutting the buildings and were filling a dumpster they had put in place.

97. Mr. Titsworth again told them to leave.

98. One of the workers called his boss and gave Mr. Titsworth the phone.

99. The boss, identity unknown to Titsworth Properties, told him to go to City Hall.

100. The workers went back to work.

101. At no time did Mr. Titsworth give the workers permission to enter the building or do work on the building.

102. Mr. Titsworth went to City Hall, Room 429, which is the office of the Building Division and where one goes for permits.

103. Mr. Titsworth spoke to a supervisor, identity unknown to Mr. Titsworth, who told him that the City had sent notices of the work to Titsworth Properties.

104. As stated above the two notices had all been sent to the wrong zip code and in the latter case had gone to a building which Titsworth Properties no longer owned.

105. The supervisor or someone else in the office told Mr. Titsworth to speak to Banjo.

106. Mr. Titsworth immediately called Banjo from the phone there in Room 429.

107.    Banjo told Mr. Titsworth to call ACA Wood in the City of St. Louis Law Department, Problem Properties Unit, City Hall Room 4025.

108.    Mr. Titsworth called ACA Wood and left a voice mail to call back.  She did not call back within a day or two.

109.    Titsworth Properties then retained counsel and applied for a Temporary Restraining Order.

110.    On April 12, 2023, the court issued a Temporary Restraining Order to stop workers from demolishing or rehabbing the buildings, Case No. 2322-CC00717.

111.    That TRO was continued several times.

112.    At one of the hearings on a continuation of the TRO Banjo stated under oath that he was the inspector for the property.

113.    At another such hearing an attorney for the City gave Mr. Titsworth a copy of a letter indicating that work had to be done at the buildings which would cost in excess of $200,000.00.

114.    In the face of these circumstances, Mr. Titsworth, as the representative of Titsworth Properties, decided to begin his own rehabilitation work on the property.

115.    Titsworth Properties applied for permits to do work itself on the roof, and to install floors and rebuild exterior walls with total costs of $65,000.00.

116.    Titsworth Properties initial permit application stated incorrectly that the work would cost $15,000.00.

117.    That application was denied by Dale Ruthsatz with SLDC.

118.    Titsworth Properties resubmitted the applications at a higher cost figure.

119.    The City issued Titsworth Properties the permits a few days before November 8, 2023.

14

120.   Once Titsworth Properties obtained the permits the court promptly dissolved the TRO.

121.   Before Titsworth Properties started its own work in approximately January of 2024, workers on inference under the management and control of Banjo and/or the City, began doing work at the building.

122.   Mr. Titsworth had still never given the City permission to have workers enter the buildings or to do work at the buildings.

123.   The workers put a roof on the building to the south, installed a subfloor, did spot tuckpointing, and tore down and rebuilt a wall on the northeast side of the building to the north.

124.   The market value of that work is in the range of $65,000.00.

125.   One day Mr. Titsworth saw the same workers engaging in construction at a property nearby which is owned by Banjo.

126.   A few months went by and in the summer of 2024, Mr. Titsworth went by the property and Banjo was there.  They spoke and Banjo said Mr. Titsworth would receive a letter about how much he owed.

127.   Throughout this period Mr. Titsworth did not make Banjo and the workers leave, because the TRO had been vacated.

128.   Mr. Titsworth was aware from the letters he had received at court that the bill was going to be in excess of $200,000.00.

129.   In anticipation of the allegedly coming bill, Mr. Titsworth contacted various offices and persons at the City and eventually was diverted to a person named Valencia Blake. She told Mr. Titsworth that she and Banjo would have a discussion with him about setting up a payment plan.

130.   No meeting occurred between Mr. Titsworth, Ms. Blake and Banjo.

131.   Mr. Titsworth eventually again spoke directly to Banjo.  Banjo told him that Mr. Titsworth had one year to set up a payment plan with him and Blake and pay within that time, but that if Mr. Titsworth did not pay him within that time the City would then put the bill on the tax records.

**Bill for Work**

132.   On October 18, 2024, Ed Ware, Building Commissioner, sent a letter to Darlene Green, Comptroller, stating that the City had incurred costs at the property in the amount of $249,547.00.  He attached a "SPECIAL TAX BILL."

133.   The amount of that bill was false in that the fair market value of work done was worth far less than that amount.

134.   On inference the bill was calculated by persons working for Mr. Ware and over whom Ware had supervisory responsibility.

135.   It would have been obvious to any reasonable person that the bill was incorrect.

136.   The documents also include an Invoice dated July 8, 2024, with the following words:

ARPA Construction for alternations to property located at 4831-37 Fountain Avenue.

137.   On December 5, 2024, someone or some entity, all unknown to Mr. Titsworth, sent papers related to this situation to Titsworth Properties at "756 Bayard Ave., St. Louis, MO 63108."  That address is down the street from the property at issue here.  The address is handwritten on the envelope.  Mr. Titsworth gets mail there, but the property is unoccupied.  There is no return address on the envelope.

138.   The envelope has a sticker stating, "Certified Mail," but the letter was merely in the mailbox there and neither Mr. Titsworth nor anyone else had signed for it.  Mr. Titsworth

16

found the letter in the mailbox at that property.

139.    The letter contained a bill for $249,547.00.

140.    Mr. Titsworth believes the bill for $249,547.00 to be fraudulent, because the market value of the work is vastly less than that amount.

141.    Titsworth Properties has paid none of that bill.

142.    On inference the City has paid Banjo, his contractors associated with him, and/or others all or part of the billed amount.

143.    The bill has not yet appeared as a tax lien on the property.

### Payment to Contractors, Possible Kickbacks

144.    On inference the City's contractors paid kick-backs to government officials.

### Damages

145.    The seizure of Titsworth Properties' building by Defendants entering onto it and working on it were constitutional insults, particularly a violation of Titsworth Properties':

        a.      Fourth Amendment right to be free of unreasonable seizure,

        b.      Fourteenth Amendment right to procedural due process, and

        c.      Fourteenth Amendment right to substantive due process.

146.    If Titsworth Properties were to try to sell the property the sale would be unable to be completed because Mr. Titsworth on behalf of Titsworth Properties would have to disclose the dispute over the bill to the Buyer, and as a result the sale would not close. The bill is therefore a slander on Titsworth Properties' title.

### UNIFIED COLLECTIVE URBAN REDEVELOPMENT GROUP, LLC
### Background

147.    Plaintiff Unified Collective Urban Redevelopment Group, LLC owns the land and

17

residential building at 1417 Angelica.  The property is located a few blocks east of
Fairgrounds Park.  The building at that location was built many decades ago. It is a two
family.

148.   Unified purchased the property and building in 2021.

149.   At all relevant times the walls have been plumb and at all times the building has been in
all other ways structurally sound.  One corner of the rear roof has some missing bricks.
When Unified purchased the building it was in very poor condition.

150.   At all relevant times the building has been secure, that is, with boarded up windows and
doors.

151.   At all relevant times the building has lacked plumbing, heating, water and electric.

152.   It would take at least one hundred thousand dollars to fully fix up the building so as to
make it economically viable for rental, but at the present time the economy of the
neighborhood makes it impossible for such an investment in the building to be profitable.

153.   Ms. Moody is an experienced real estate developer and general contractor.

**Preserve and Rehabilitate Program**

154.   On October 24, 2023, Moody received a letter at her post box stating that a building
permit had been taken out on her property at 1417 Angelica.

155.   She knew that neither she nor her company had applied for such a permit.

156.   Such a permit has been issued on October 6, 2023, to "Maxify Contractors c/o Max
Arinze."

157.   Maxify Contractors, LLC, LC1792398 was created on June 3, 2021, with Ifeanyi Arinze
listed as the organizer, at 7715 Woodstock Rd, St. Louis, MO  63135, and the Registered
Agent as Godfrey Ekwenugo at 6318 Coventry, Florissant, MO  63033.

158. On that October 24, 2024, Moody went to the property and there were several Mexicans working there cleaning out the building, including taking out old joists and studs. The Mexicans had poor English-speaking skills.

159. Debris was piled up in front of the building.

160. Moody had never given them or any other persons permission to enter the building, and/or enter the building and/or do work on the building.

161. Moody told them to leave.

162. The leader of the workers called someone and handed the phone to Moody.

163. Moody determined that she was speaking to Ifeanyi Arinze.

164. Moody asked her "Who are you to Banjo?"

165. Arinze said she did not know who Banjo was and stated; "The City hired me to do the work."

166. Arinze indicated that she was a Registered Nurse. Moody also determined that Arinze was of African descent.

167. Moody said it was strange that Arinze was an RN and of African descent. Moody told Arinze that she knew in her heart that Arinze was connected to Banjo and they were committing some kind of fraud.

168. Arinze said she did not understand and that she would call back, and she hung up the phone.

169. Moody called 911 and two police officers came to the scene.

170. Moody called Arinze back and one of the officers spoke to her. That officer made other calls including to the Building Division.

171. The officer told Moody that he had spoken to someone over the Building Division and

"there was nobody over him."

172. The officer eventually told Moody that the person he had spoken to told him that workers had a right to be there, and she was trespassing and had to leave or she would be locked up.

173. Moody left.

174. Moody went directly to the Neighborhood Stabilization Office at 1520 Market and spoke to Karen Clifford. Clifford said her office had been purposely left out of the loop but that she would help.

175. Moody called and wrote Clifford the next day, October 25, 2023, again seeking help.

176. Clifford called Moody back once and said she was looking into it but was hitting a brick wall.

177. Moody tried to contact her several more times, but Clifford ghosted Moody.

178. Moody kept asking questions at City Hall Building Division and one employee there eventually gave Moody Banjo's number on a sticky note.

179. Moody called Banjo who stated that the City had sent Moody her paperwork certified mail to her PO box about the situation.

180. Moody has never received such a mailing.

181. Moody said she had not received the paperwork, and Banjo agreed to resend it, which he did to Moody's secondary PO Box, and Moody then did receive that paperwork.

182. The paperwork indicated it had originally gone to Moody's prior address on Lafayette, from which she had moved out in November of 2022.

183. At all times Moody had had her mail from that address forwarded to her post office box.

184. The paperwork, dated April 7, 2023, was a "Notice of Condemnation," and included a

notice of a right to appeal within 10 days.

185.   The inspector was stated to be "Scott Lind."

186.   Moody then obtained a copy of a May 1, 2023, "Notice of Intent to Preserve and Rehabilitate Structure."

187.   That document described several items as requiring work at the building.

188.   The following items on the list were indeed problems:  windows missing, roof defect, roof leaking, interior of structure deteriorated.

189.   The following items on the list, however, were not problems:  walls collapsed, building intended to be used for illegal purpose, porch missing, bulged shifted.

190.   Moody did nothing further.

191.   On September 5, 2024, ACA Wood called Moody's friend Michael Cantrell and after asserting that he was the owner told him that she was concerned about the property.

192.   Cantrell told her he did not own the building but that he would text Cantrell's contact information to her, which he did.

193.   Cantrell then texted Moody ACA Wood's contact information and Moody reached out to her.

194.   Moody called ACA Wood back.  They discussed an appeal, and ACA Wood said it was too late because Moody only had a five-day window to appeal and that time period had expired, and that Moody had to pay, or she would lose the property.

195.   Recently Valencia Blake, the Program Manager of Stable Communities STL, ("SLDC"), which is a City Agency, contacted Moody and asked for access to the property to conduct an audit to be sure the work had been done.  Moody was suspicious and said no.

**Tax Lien**

196.    The city placed a tax lien on the property for tax year 2023 in the amount of $139,322.09, which has since then increased to $175,546.08.

### Payment to Contractors, Possible Kickbacks

197.    On inference the City paid the contractors who did the work.

198.    On inference the contractors paid kick-backs to government officials.

### Damages

199.    The seizure of Unified's building by Defendants entering onto it and working on it was a constitutional insult, and sending her false notices, were violations of Unified's:

  a.    Fourth Amendment right to be free of unreasonable seizure,

  b.    Fourteenth Amendment right to procedural due process, and

  c.    Fourteenth Amendment right to substantive due process.

200.    The tax bill is a slander on Unified's title.

### JASON LeROY STATEN

201.    Plaintiff Jason LeRoy Staten owns the land and residential bldg. at 4809-4811 Fountain. The property is four blocks north of Delmar half a block east of Fountain Park. The building at that location was built many decades ago.

202.    Staten grew up in the home and in 2009 obtained the property and building from his grandmother.[3]

203.    Staten lived there until 2013.

204.    Since 2013 the house has been unoccupied, without water, heat or electric.

205.    Since 2013 Staten has kept personal property at the house, including such items as

---

[3] When he obtained the property he owned it with Inez M. Spencer but she died on March 6, 2009.

furniture, clothes, and often his dogs.

206.   Recently a pipe in the basement has been dripping, with the output going down the basement drain.

207.   Staten nevertheless even now considers the property to be the place he intends to return to as his home.

208.   Staten goes by the house almost every day.

209.   Staten keeps up the front façade of the house, which is in good condition.

210.   Staten put on a new roof in 2008.

211.   With some exceptions immediately corrected, at all relevant times the building has been secure, that is, with locked doors and boarded up windows.

212.   Improvements included but were not limited to a new garage door, and a resecured top post for the front handrail.  He also performed cosmetic work on the inside of the house.

213.   Since then, there have been break-ins and parts of the interior have been destroyed.

214.   In 2022 someone stole bricks from the rear of the house and therefore at present the rear of the house is not structurally sound.

215.   It would take around $150,000.00 to fully fix up the building and to make it livable.

216.   Staten has a good reputation as a law-abiding member of the community.

**Preserve and Rehabilitate Program**

217.   In early 2023 the City pulled a permit in Staten's name to do work on the property.

218.   Staten had never consented to the City's use of his name in that way.

219.   Staten had not applied for a building permit himself.

220.   On November 1, 2023, a neighbor to the property called Staten and said that there were workers at the property who were pitching stuff out the door and who were up on the

roof.

221.   Staten has never authorized or given permission for any persons to enter the property or go on the roof to do such work.

222.   Mail to the property is sporadic, perhaps because no one lives at the property. full time.

223.   Staten had received no paperwork regarding such work.

224.   Upon receiving the phone call from the neighbor Staten went to the property and encountered approximately 8 Mexicans and 2 African-Americans inside and on the roof of the property.

225.   Staten identified himself as the owner and told them to leave.

226.   One of the workers said that a Mr. Brockworth hired them.  That worker called Mr. Bockworth on his phone.

227.   Staten got on the worker's phone and asked: "Who authorized this?"  After back and forth the call ended when the person at the other end of the call saying he was on the way to the property.

228.   Another person, a female, identity unknown, called Staten back from 636-755-0694 and said that Staten did not have the right to be there, was a trespasser and did not own his property anymore, and that she would call the police.  She said she was in route to the property as well, and the call ended.

229.   That lady and the police arrived at about the same time.  The lady told the police to make Staten leave.

230.   A police officer told Staten that the workers had a work order and if he did not leave, they would arrest him.

231.   Bockworth never did appear.

232.   On October 27, 2023, the City had approved the bid for the permit that the City had previously pulled.

233.   Staten went to City Hall and spoke to "Ms. Burton" in Public Safety.

234.   While Staten and Mr. Burton were talking, Banjo came onto a phone call on speaker phone.

235.   Staten asked Banjo who had authorized the work. There ensued a dispute over the facts because Banjo said the City had left a notice on the property before the work started, but Staten had been to the property every day, and there had been no such paperwork left at the property at any relevant time.

236.   Banjo said he would bring him the paperwork, that he was contracted to do the work, and that he would call Staten when the work was complete.

237.   Staten complained to Banjo during the call about his personal property being thrown out.

238.   Banjo said that Staten's personal property was "debris."

239.   Staten's personal property was not and is not debris but is his property to do with as he chooses.

240.   Banjo said the cost of the roof, gutter work, and debris clean out was $80,000.00.

241.   Banjo said the work had been subbed out.

242.   Staten went back to the property and a Mexican worker said, "Someone comes by every day at 5:00 and pays us. We work for Banjo."

243.   Before the alleged work, the roof did not leak.

244.   At some point unknown workers had put a new rubber liner on part of the roof and worked on the gutters.

245.   One of the gutters fell off two days later.

246.  Whatever work Banjo and the Mexican workers did on the roof and gutters was done poorly and subpar.

247.  After the workers left and since that time the roof has leaked.

248.  The workers also damaged the drainage arrangements so that there is now water in the basement where there had been none before, and the workers also damaged the house's front entry and locks.

249.  The workers did do some well executed brick work on the basement part of the wall at the rear of the property and did good work on the basement rear window, but the rest of the work was shoddy.

250.  The workers also did some tuckpointing but it was of poor quality.

251.  As of this filing the house is not habitable.

### Housing Court

252.  Staten received a citation for housing court for building code violations at the property and went to his court date on May 23, 2023. He pled guilty and was fined $500.00.  He paid the fine.

### Tax Lien and Bill

253.  Before the Preserve and Rehabilitate Program Staten's real estate property taxes were in the range of $400.00.

254.  On December 12, 2023, the City issued Staten a invoice for $101,200.00, which was $92,000.00 for "Construction Paid Through ARPA" "Stabilization by the City of St. Louis ARPA, plus a 10% administrative fee of $9,200.00.

255.  On February 16, 2024, Frank Oswald, Building Commissioner, sent a letter to Darlene Green, Comptroller stating:

Pursuant to Chapter 25.02.010 Sections 119.3 and 199.5 of the Revised Code of the City of St. Louis and Mayor's Office Executive Order # 76, I certify that the City of St. Louis has incurred costs of $101,200.00 in costs for abatement/building stabilization, board up and/or clean up at 4809 Fountain Ave.

The owner(s) have refused to pay these costs.  Please prepare a special tax bill for this amount which includes administrative cost totaling ten percent of the contract price.

256.   That amount was false in that the fair market value of work done was worth far less than that amount.

257.   On inference the bill was calculated by persons working for Oswald and over whom Oswald had supervisory responsibility.

258.   It would have been obvious to any reasonable person that the bill was incorrect.

259.   On March 20, 2024, Green issued Staten a "Special Tax Bill" for $101,200.00, plus interest at 10% per annum.

260.   That was added to Staten's regular taxes.

261.   The Special Tax Bill was issued and signed by Darlene Green, Comptroller.

262.   Staten's 2023 real estate tax bill for the property is $121,923.36.

263.   It appears that Green tacked on another 10% administrative fee and an entire year's interest, although that would be $121,440.00, with the $483.46 difference unexplained.

264.   Staten has paid none of that real estate tax bill.

### Payment to Contractors, Possible Kickbacks

265.   On inference the City paid the contractors who did the work.

266.   On inference the contractors paid kickbacks to government officials, including Banjo.

### Damages

267.   The seizure of Staten's building by Defendants entering onto it and working on it was a constitutional insult, particularly a violation of Staten's:

a.      Fourth Amendment right to be free of unreasonable seizure, and

b.      Fourteenth Amendment right to procedural due process.

c.      Fourteenth Amendment right to substantive due process

268.   The tax bill is a slander on Staten's title.

269.   Staten considers the home his priceless heritage.

270.   The dispute has caused Staten to suffer garden variety emotional distress.

271.   As a result of the City's conduct Staten has feelings of hopelessness for himself and his family.

272.   Staten wants to leave a heritage for his children so they can say their family has lived in the home for 100 years.

## ANTHONY PITALE AND VERONICA ERB

273.   Plaintiffs Anthony Pitale and Veronica Erb, husband and wife, own the land and commercial building at 774 Hodiamont.  The property is three blocks north of Delmar and two blocks west of Skinker, on the northeast side of the MetroLink tracks.  Their building at that location was built many decades ago.

274.   On February 29, 2024, Pitale and Erb purchased the property and building from Emergency Physicians, LLC for $75,000.00, as is.

275.   The building was unoccupied, without gas, water, sewer or electricity, and appeared to have been unoccupied for a substantial period of time.

276.   At the time they purchased the building the roof appeared to be new and in good condition.  The walls were plumb and the building was in otherwise reasonable condition.

277.   Before they closed, they learned that permits had been pulled for roof and gutter work in the name of "Emergency Physicians."

278.  Pitale and Erb presumed the roof had been repaired by Emergency Physicians, LLC, the prior owner, pursuant to the permit.

279.  Pitale and Erb did not get a formal building inspection, although they did have the sewer scoped professionally.

280.  Pitale and Erb purchased title insurance.

281.  In connection with the closing a representative of seller Emergency Physicians signed a customary seller's affidavit stating that those associated with the seller knew of no liens.

282.  When Pitale and Erb purchased the property there were was a back water bill of less than $1,000.00.  In the course of closing they paid off that bill.

283.  Pitale and Erb planned to use the property to store Pitale's personal classic cars and to work on other classic cars.

284.  At the time of purchase Pitale and Erb had no knowledge that the City had done work at the building or that the City had any claim for money owed in connection with the building.

285.  After purchasing the building Pitale and Erb promptly obtained permits and had professionals put in new garage doors, rough in water and sewer, and perform limited electric work.  They had planned to do substantial parts of the further work needed on the building.

286.  Thus far they have spent approximately $40,000.00 on the building.

287.  At all relevant times while Pitale and Erb have owned the building they have kept it secure, that is, with locked doors and boarded up windows.

288.  It will take approximately an additional $60,000.00 dollars to fully fix up the building so as to make it usable for the purposes for which Pitale and Erb intend to use the property.

**Preserve and Rehabilitate Program**

289.   On March 6, 2024, six days after purchasing the building, Pitale and Erb went by the

building and saw a notice from the City which stated among other things: "This building

has been stabilized."

290.   On June 28, 2024, Pitale and Erb received at their home address a written notice by

regular mail dated June 24, 2024, which stated that they owed $109,100.00 in taxes for

repairs.

291.   There was a long list of allegedly needed repairs.  Some of the items were correct, such

as the need for a roof, but most were absurd such as:

   a.   "Interior Structure Deteriorated, [stairway, hall, living room, dining room,

      bedroom, kitchen, toilet, basement]."  In fact, the building is one story empty

      commercial space with neither basement nor rooms normally associated with a

      house such as living and dining rooms and a kitchen.

   b.   "The building or structure has improperly distributed loads upon floors or roof

      causing overload conditions which may cause the building or structure to become

      unsafe and endanger the lives or safety of property."  In fact, the floor was

      concrete and the roof (albeit improperly constructed by the City as described

      below) was new.

292.   Pitale and Erb eventually received by request of their counsel an itemized list of repairs

with costs for each line item.  Many items were, again, absurd:

   a.   1. "Board up all openings $10,000.00."  In fact, the building has three windows

      and two garage doors.  Only one was boarded up.  The material used was not to

      code and the cost was unreasonable.

b.    3. "Remove and replace collapsed/damaged interior floor joists and subfloor, $12,000." In fact, there is no subfloor and there are no floor joists.

c.    5. "Rebuild side wall $6,000.00." In fact, no permit was pulled for this and no side wall was rebuilt.

d.    6. "Clear and remove all exterior debris, brush, trees and vines $8,000.00." In fact, the building fills the lot so there have never been any brush, trees or vines growing on the property. There also have never been any exterior debris on the property.

e.    7. "Clean out and remove all interior debris $10,000.00." When Pitale and Erb purchased the property there was substantial interior debris, so it had not been cleaned out.

f.    9. "Remove and replace collapsed stair and rebuilt damaged dormer/window on top of the roof $2,500.00." In fact, there is no stairway, and there are no dormers.

293.    Pitale and Erb retained an attorney who made phone calls and wrote e-mails to ACA Wood, City Counselor Sheena Hamilton, and others at City Hall inquiring about the details of the tax bill. The attorney received no substantive responses.

294.    Pitale contacted the Alderman for the property, Shameen Clark Hubbard, and the Alderman for the location of their home in South City, Daniella Velazquez. Each offered sympathy but no substantive assistance.

295.    ACA Wood then called Pitale and Erb's attorney and offered to cut the tax bill in half.[4]

296.    Through counsel, Pitale and Erb rejected that offer.

297.    ACA Wood then again called counsel and offered to settle for $25,000.00 which ACA

---

[4] Settlement discussions included for demonstration of conspiracy, and role of Ex-Mayor Jones.

Wood asserted was the cost of the roof.

298.   Pitale and Erb examined the roof more closely and determintd that the rafters are made from 2x8 lumber instead of the building code required 2x10 lumber, and the rafters are placed 19 inches on center instead of the building code required 12 inches on center.

299.   Further the rafters are not installed plumb but are installed slightly off plumb.

300.   The roof is currently keeping water out, but it is of limited life span and is out of code.

301.   Pitale and Erb have refused to pay funds to the City.

302.   The City sent Pitale and Erb paperwork showing that the work was performed by Farst Construction Company.  Farst Construction Company is a d/b/a owned by Farst Construction Limited Liability Company, ("Farst").

303.   The Registered Agent of that limited liability company is Osiki Feyiseye, with address listed as 920 Bayard Ave, St. Louis, MO  63108.  The building at that address is run down and overgrown with several windows boarded up and is apparently unoccupied.

304.   On information and belief, as has been reported in the press, Banjo is married to or at one time was married to the person in St. Louis who was receiving mail for Farst.

305.   Pitale and Erb have obtained a handwritten bid to the City from "Farst Construction" for $99,100.00 for the items on the list.

306.   In late November Erb received by mail at their home a notice that the City had condemned the property.

307.   This notice was "So Ordered" by Anthony Morrow.  The list of items was the exact same list that the City had sent before, and all the misstatements were the same.

308.   The property is not in any way dangerous to the public or in danger of falling down.

309.   There is no reason for the building to be condemned.

310.   The City never put a tax bill on the property, but the City has demanded from Pitale and Erb's counsel that they pay $25,000.00.

311.   The City had on May 8, 2023, sent a notice to Emergency Physicians Consultants, LLC titled:

NOTICE OF INTENT TO PRESERVE AND REHABILITATE STRUCTURE

312.   Pitale and Erb have also learned that on April 13, 2023, the City had sent a notice to Emergency Physicians Consultants, LLC, titled:

NOTICE OF CONDEMNATION

313.   That notice was materially false in the same many ways as stated above.

**Damages**

314.   The dispute is a slander on Pitale and Erb's title, for were they to try to sell the property they would have a duty to disclose the dispute to the Buyer.

315.   The dispute has caused Pitale and Erb to suffer garden variety emotional distress.

316.   The false statements by Morrow and the City were constitutional insults, particularly

  a.   Fourteenth Amendment right to procedural due process, and

  b.   Fourteenth Amendment right to substantive due process.

**PAYMENT TO CONTRACTORS**

317.   The City paid the contractors who did the work at the properties.

**BANJO SELF-DEALING**

318.   On inference, Banjo was self-dealing in that it was companies he owned or had an interest in which were doing at least some of whatever work was done and the City was paying that company or those companies.

**OSWALD AND WARE RUNNING BUILDING DIVISION
ON INFERENCE, KNOWLEDGE, FAILURE TO SUPERVISE, OBVIOUS**

33

319.  The Preserve and Rehabilitate Program fell under the purview of the Building Division of the City of St. Louis

320.  At all relevant times Ex-Building Commissioner Frank Oswald and Building Commissioner Ed Ware were in charge of the Building Division of the City of St. Louis and had final authority over the Building Division.

321.  The conduct of the building inspectors under their supervision and control, that is those building inspectors  who committed the misconduct described herein, was widespread and unconstitutional in material ways.

322.  On inference, Oswald and Ware had knowledge of their misconduct.

323.  Oswald and Ware failed to properly supervise the building inspector Defendants.

324.  The conduct of the building inspectors under his supervision and control who committed the misconduct was obvious.

**CONDITIONS APPLICABLE TO ALL PROPERTIES**

325.  In some of the neighborhoods where the above properties are located there is strong economical activity, including barber shops, stores, day care centers, schools, etc.

326.  Nevertheless, in most of the neighborhoods some of properties near the above described properties, due to economic decline, crime, bad local government, and perhaps other reasons, are vacant, boarded up, and/or deteriorated.

327.  Some properties near the properties are undergoing rehabilitation, in some cases more quickly, and some cases more slowly.

328.  Each Plaintiff property owner has the right to own the property and hope for economic improvement or other factors that would enable investment in the building to be profitable.

329.   Each property owner has the right to hold and own the property as that owner sees fit, as long as there are not public safety violations.

330.   Each Plaintiff has no duty to explain decisions about whether to continue to own the property, or to sell the property.

### INDIVIDUAL DEFENDANTS ALL MADE FALSE STATEMENTS

331.   Each individual Defendant made at least one false statement in connection with the Preserve and Rehabilitate Program.

332.   Oswald and Ware submitted bills to the Comptroller.  The bills were fraudulent in that they included work not done and/or work done at far above market price.  (On inference discovery will reveal all the bills, some of which are not yet in Plaintiffs' hands).

333.   The persons who put those bill together were working under Oswald and Ware.

334.   That the bills were fraudulent was obvious.

335.   On inference, Oswald and Ware signed off on the bills for the Plaintiffs who received tax bills, and in all the cases that the bills were fraudulent was again obvious.

### SUBSTANTIVE DUE PROCESS

336.   The conduct of all Defendants herein shocks the conscience or interferes with rights implicit in the concept of ordered liberty.

### CONSPIRACY, OBJECTIVE OF THE CONSPIRACY, MEETING OF THE MINDS

337.   All Defendants were engaged in a conspiracy.

338.   The objective of the conspiracy was to obtain money by doing work which, as stated above, was unneeded and/or done poorly, and to obtain payment for the work from the City, and to pay kickbacks to city officials in exchange for their support of the Preserve and Rehabilitate Program.

339.  Defendants had a meeting of the minds to perform work pursuant to the Preserve and Rehabilitate Program which was not needed and was done improperly, and to bill the owners or lien properties for that work.

### FOURTH AMENDMENT SEIZURE

340.  The conduct of Defendants was a Fourth Amendment seizure.

### PROCEDURAL DUE PROCESS

341.  There were insufficient notices and/or hearings in these cases, before entry onto Plaintiffs' properties, and/or the performance of repair work on those properties, and/or the slandering of Plaintiff's titles with tax bills and liens.

### *MONELL* LIABILITY

### Obvious to Supervisors

342.  Supervisors and the Jones of the City failed to supervise the work of the other Defendants in the Preserve and Rehabilitate Program.

343.  Supervisors and Jones knew or should have known of the risk that the other Defendants were engaging in the conduct described in paragraph First, because the risk was obvious.

### Ex- Mayor Jones, Oswald and Ware, Participation, Official Capacity

344.  It was the city's policy under the Preserve and Rehabilitate Program to unconstitutionally enter onto Plaintiffs' properties, fail to provide the procedural due process, and to slander their titles.

345.  While she was Mayor, Ex-Mayor Jones in her official capacity had final authority to establish the City's policies in connection with the Preserve and Rehabilitate Program.

346.  As Mayor, Ex-Mayor Jones in her official capacity was intimately involved in the Preserve and Rehabilitate Program.

347.  While Mayor, she Ex-Mayor Jones stated in her official capacity only that there was no room for owners to leave their property deteriorated.

348.  That statement belies the realities of the economics of certain areas of the City of St. Louis, where investments at this time would be doomed to be wasted, and where many buildings are in a deteriorated condition.

349.  That statement belies that only some buildings were subject to the Preserve and Rehabilitate Program and there was no meaningful sorting of properties between those which would and would not be part of the program.

350.  Ex-Mayor Jones falsely stated at a public meeting that Pitale and Erb had accepted a $25,000.00 reduction in their bill as a settlement.

351.  The city had made Pitale and Erb such an offer but they had not accepted it.

352.  Ex-Mayor Jones was at all relevant times the highest elected official of the city.

353.  On inference, Oswald and Ware was involved in the Preserve and Rehabilitate Program and also had final authority to make policy in connection with that program.

**Official Policy**

354.  It was official policy of the City, stated in the Ordinance, to do repairs on houses without proper due process and to then bill the residents thereby slandering their title.

**Custom and Practice**

355.  It was the custom and practice of the City of St. Louis to engage in the unconstitutional conduct described herein.

**ON INFERENCE, KICKBACKS**

356.  On inference, based on the falsehoods in the notices and other falsehoods, there were kickbacks paid in connection with this program, for otherwise supervisors would have

shut it down.  Discovery is expected to reveal theses kickbacks and show the details.

## ATTORNEY'S FEES AND COSTS

357.    In pursuit of their § 1983 civil rights claim, Plaintiffs are incurring reasonable attorney's fees, and also taxable and non-taxable costs.

## PROGRAM HALTED

358.    The day before the filing of this case new City of St. Louis Mayor announced that the City would halt the Preserve and Rehabilitate Program and tax liens would be released.

359.    As of this filing the tax liens have not been released.

360.    If they are released the prior slanders of title will still entitle the Plaintiffs to damages.

## COUNT I
## DENIAL OF SUBSTANTIVE DUE PROCESS
## ALL PLAINTIFFS
## AGAINST ALL DEFENDANTS

361.    Plaintiffs incorporate all prior paragraphs.

362.    *First*, Defendants sent notices to Plaintiffs which contained falsehoods, and/or did not notice to Plaintiff of work at their properties to be done, and/or did work that did not need to be done for the health and safety of the public, and/or did shoddy construction work at Plaintiff's property, and/or were actively involved in bills being sent to Plaintiffs for work not done at their property or work poorly done at their property and/or at far above market prices, and/or negatively affected Plaintiffs' title to their property through liens and/or tax bills, and

363.    *Second*, the Defendants' conduct shocks the conscience, and

364.   *Third,* as a direct result, the Plaintiffs were damaged.[5]

WHEREFORE, all Plaintiffs pray for judgment against all Defendants, jointly and severally for denial of substantive due process, for actual damages, and punitive damages, (except no punitive damages against the City), for taxable and non-taxable costs, attorney's fees, and for such other orders as the court finds to be just, meet and reasonable.

### COUNT II
### CIVIL CONSPIRACY
### ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS

365.   Plaintiffs incorporate all prior paragraphs.

366.   *First*, Defendants conspired with each other to deprive Plaintiffs of their constitutional right(s) as set forth in this Complaint; and

367.   *Second*, at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy,

368.   *Third*, the overt act(s) injured the plaintiffs.[6]

WHEREFORE, Plaintiffs pray for judgment against all Defendants, jointly and severally for civil conspiracy for actual damages, and punitive damages, (except no punitive damages against the City), for taxable and non-taxable costs, attorney's fees, and for such other orders as the court finds to be just, meet and reasonable.

### COUNT III
### FOURTH AMENDMENT SEIZURE OF REAL PROPERTY
### ALL PLAINTIFFS
### AGAINST ALL DEFENDANTS EXCEPT CITY, JONES, WARE AND ODWALD

---

[5] 8th Cir Model Jury Instructions 4.40, *Pediatric Specialty Care, Inc. v. Arkansas Dep't of Hum. Servs.*, 364 F.3d 925, 931–32 (8th Cir. 2004), *Flowers v. City of Minneapolis, Minn.*, 478 F.3d 869, 873 (8th Cir. 2007).  Whether the conduct "shocks the conscience" is generally for the court, not the jury.
[6] 8th Cir Model Jury Instructions 4.52, *Solomon v. Petray*, 795 F.3d 777, 789 (8th Cir. 2015).

369.    Plaintiffs incorporate all prior paragraphs.

370.    *First*, the following Defendants meaningfully interfered with the following Plaintiff's possessory interests in their properties.

| | |
|---|---|
| Bldg Insp. John Watson | JAG4, LLC |
| Bldg Inspector Banjo: | All Plaintiffs |
| Maxify Contrators, LLC | Unified Collective Urban Redevelopment Group, LLC |
| Ifeanyi Arinze | Unified Collective Urban Redevelopment Group, LLC |
| Bldg Insp. Anthony Morrow | Anthony Pitale and Veronica Erb |
| Bldg Insp. Scott Lind | Unified Collective Urban Redevelopment Group, LLC, |
| Farst Construction LimLiaCom | Anthony Pitale and Veronica Erb |

371.    *Second*, that interference was not reasonably necessary for the protection of the health and safety of the public,

372.    *Third,* as a direct result, the above Plaintiffs were damaged.[7]

WHEREFORE, all Plaintiffs pray for judgment against the above Defendants jointly and severally for Fourth Amendment seizure, for actual damages, and punitive damages, for taxable and non-taxable costs, attorney's fees, and for such other orders as the court finds to be just, meet and reasonable.

## COUNT IV
## DENIAL OF PROCEDURAL DUE PROCESS
## ALL PLAINTIFFS

---

[7] 8th Cir Model Jury Instructions, 4.40, *Soldal v. Cook County,* 506 U.S. 56, 61 (1992) *Audio Odyssey, Ltd. v. Brenton First Nat. Bank*, 245 F.3d 721, 735 (8th Cir. 2001)

**AGAINST CITY, JONES, OSWALD, WARE, WATSON, BANJO, MORROW, LIND**

373.   Plaintiffs incorporate all prior paragraphs.

374.   *First*, the following Defendants failed to give Plaintiffs either notice or hearing regarding the work being done at their property, and/or gave Plaintiffs notice of deficiencies at their property which were materially false.

| | |
|---|---|
| City | All Plaintiffs |
| Oswald | To be determined in discovery |
| Ware | To be determined in disovery |
| Bldg Insp. John Watson | City, JAG4, LLC |
| Bldg Insp. Banjo | All Plaintiffs |
| Bldg Insp. Scott Lind | Unified Collective Urban Redevelopment Group, LLC, |
| Bldg Insp. Anthony Morrow | Anthony Pitale and Veronica Erb |
| Farst Construction LimLiaCom | Anthony Pitale and Veronica Erb |

375.   *Second*, as a direct result, the Plaintiffs were damaged.[8]

WHEREFORE, the above Plaintiffs pray for judgment against the above Defendants, jointly and severally for denial of procedural due process, for actual damages, and punitive damages (except no punitive damages against the City), for taxable and non-taxable costs, attorney's fees, and for such other orders as the court finds to be just, meet and reasonable.

**COUNT V**
**MONELL**
**AGAINST CITY OF ST. LOUIS**

---

[8] 8th Cir Model Jury Instructions 4.40, *Pesce v. City of Des Moines, Iowa*, 439 F. Supp. 3d 1101, 1123 (S.D. Iowa 2020), *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011).

376.    Plaintiffs incorporate all prior paragraphs.

**First Theory of *Monell* Liability, In the Alternative**
**Failure to Supervise, Obvious**

377.    *First*, Defendants sent notices to Plaintiffs which contained falsehoods, and/or did not

notice to Plaintiff of work at their properties to be done, and/or did work that did not need

to be done for the health and safety of the public, and/or did shoddy construction work at

Plaintiff's property, and/or were actively involved in bills being sent to Plaintiffs for work

not done at their property or work poorly done at their property and/or at far above

market prices, and/or negatively affected Plaintiffs' title to their property through liens

and/or tax bills, and

378.    *Second*, Supervisors and the Mayor of the City failed to supervise the work of the other

Defendants in the Preserve and Rehabilitate Program,

379.    *Third*, Supervisors and the Mayor should have known of the risk that the other

Defendants would engage in the conduct described in paragraph First, because the risk

was obvious, and

380.    *Fourth,* as a direct result, the Plaintiffs were damaged.[9]

---

[9] *Walton v. Dawson*, 752 F.3d 1109, 1118 (8th Cir. 2014).  A municipality [may be] liable for a risk it *should have* known even if all of its employees in supervisory roles *did not* know of the risk and are thus not liable. *Compare Canton,* 489 U.S. at 390 & n. 10, 109 S.Ct. 1197 (explaining a municipality may be liable because the risk was "obvious" or "must have been plainly obvious"), *and id.* at 396, 109 S.Ct. 1197 (O'Connor, J., concurring and dissenting) (emphasizing that "actual or constructive notice" is enough).
See *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011):

> A municipal policy may be pronounced or tacit and reflected in either action or inaction. In the latter respect, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution." *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (internal quotation marks omitted); *see also City of Canton v. Harris,* 489 U.S. 378, 396 (1989)

**Second Theory of *Monell* Liability, In the Alternative**
**Custom**

381.   *First*, it was the city's custom to have building inspectors lie, for example stating that

they had inspected the interior of buildings when they had not done so, and to overcharge

for work, to perform, allow and encourage the performance of substandard work and to

slander titles with false tax bills and liens, and to violate the Plaintiff's constitutional

---

(O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied."). Consistent with this principle, "where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 126 (2d Cir.2004) (SotoMayor, J.) (internal quotation marks omitted).

Deliberate indifference may be inferred where "the need for more or better supervision to protect against constitutional violations was obvious," *Vann v. City of New York,* 72 F.3d 1040, 1049 (2d Cir.1995), but the policymaker "fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs," *Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007); *see also Board of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 407 (1997) (holding that deliberate indifference requires proof that "municipal actor disregarded a known or obvious consequence of his action" (internal quotation marks omitted)); *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992) (framing deliberate indifference inquiry in three parts: (1) policymaker knows "to a moral certainty" that its employees will confront a given situation; (2) either situation presents employees with difficult choice that will be made less so by training or supervision, or there is a record of employees mishandling situation; and (3) wrong choice by employees will frequently cause deprivation of constitutional rights (internal quotation marks omitted)).

The existence of an affirmative duty to protect does not mean that any harm that befalls a person in state custody necessarily manifests a municipal policy of deliberate indifference to prisoner safety. But an affirmative duty, by its nature, implies a proactive responsibility to assess the risks of harm presented by given circumstances and to take reasonable preventive measures in advance of harm occurring, not simply to respond to harms only after they occur. *Cf. Farmer v. Brennan,* 511 U.S. 825, 845 (1994) (observing that deliberate indifference showing in parallel Eighth Amendment context "does not require a prisoner seeking a remedy for unsafe conditions to await a tragic event such as an actual assault before obtaining relief" (internal quotation marks and brackets omitted)).
See also, *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 404-05 (1997). *S.M. v. Lincoln Cnty.*, 874 F.3d 581, 585 (8th Cir. 2017).

rights as described throughout this Complaint.[10]

382.   *Second*, the city's customs and policies were continuing, widespread, and persistent.

383.   *Third*, these unconstitutional customs and policies were imposed by or ratified by city officials with final policymaking authority.

384.   *Fourth*, the city was deliberately indifferent to or tacitly authorized this unconstitutional conduct, in that the city was aware of the misconduct yet failed to take appropriate action to prevent it.

385.   *Fifth*, these policies or customs of the city directly caused, and were the moving force behind, the violations of the Plaintiffs' constitutional rights.

386.   *Sixth,* as a direct result, the Plaintiffs were damaged.

**Third Theory of *Monell* Liability, In the Alternative**
**Unconstitutional Ordinance**

387.   *First*, Defendants sent notices to Plaintiffs which contained falsehoods, and/or did not give notice to Plaintiff of work at their properties to be done, and/or did work that did not need to be done for the health and safety of the public, and/or did shoddy construction work at Plaintiff's property, and/or sent bills to Plaintiffs for work not done at their property or work poorly done at their property, and/or negatively affected Plaintiffs' title to their property through liens and/or tax bills, and

388.   *Second*, the City's Preserve and Rehabilitate Program Ordinance that conduct.

389.   *Third,* as a direct result, the Plaintiffs were damaged. [11]

**Fourth Theory of *Monell* Liability, In the Alternative**
**Direct Role of Policy Maker**s – Ex-Mayor Jones, Ware

---

[10] *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978).
[11]*Angarita v. St. Louis County,* 981 F.2d 1537, 1546 (8th Cir.1992), *Berglund v. City of Maplewood, MN*, 173 F. Supp. 2d 935, 948 (D. Minn. 2001)

390.    *First* Ex-Mayor Tishaura Jones and (on inference) Building Commissioner Ed Ware) were directly involved in the unconstitutional conduct, and

391.    *Second,* Ex-Mayor Tishaura Jones and Building Commissioner Ed Ware had final authority over the Preserve and Rehabilitate Program, and

392.    *Third*, as a direct result, the Plaintiffs were damaged.[12]

WHEREFORE, Plaintiffs pray for judgment for compensatory damages under *Monell* against the City of St. Louis, for taxable and non-taxable costs, attorney's fees, and for such other orders as the court finds to be just, meet and reasonable.

Respectfully Submitted,

   /s/ W. Bevis Schock   .
W. Bevis Schock, 32551MO
7777 Bonhomme Ave., Ste. 1300
St. Louis, MO  63105
wbschock@schocklaw.com
Voice:  314-726-2322
Fax:      314-721-1698
Attorney for Plaintiff

   /s/ Erich Vieth
Erich Vieth, 29850 MO
20 South Sarah Street
St. Louis, MO 63108
erichviethattorney@gmail.com
Voice: (314) 604-3454
Fax: (314) 310-1181
Attorney for Plaintiff

[12]*Pembaur v. City of Cincinnati*, 475 U.S. 469, 481–83 (1986).

45