UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAG4, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-CV-599-ZMB |
| | ) | |
| CITY OF ST. LOUIS, et  al., | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM AND ORDER**

This matter is before the Court on 11 pending motions. The first set are motions to dismiss

filed by the Defendants who actually appeared and responded to the Complaint. Docs. 39, 43, 48,

49, 50, 73. Next, are Plaintiffs' motions to defer entry of judgment of default and for entry of

default judgment against Defendant Adebanjo Popoola. Docs. 70, 76. The last set of requests relate

to housekeeping for two related parties, including Plaintiffs' motion to vacate the prior dismissal

of Defendant Ifeanyi Arinze to substitute for Defendant Maxify Contractors, LLC; Plaintiffs'

motion for the Clerk's entry of default against Maxify; and Maxify's motion for extension of time

to find counsel. Docs. 81, 82, 84. Because Plaintiffs have failed to state a claim against any of the

appearing Defendants, the Court grants the motions to dismiss and dismisses the relevant claims

without prejudice. Similarly, the Plaintiffs' allegations do not sufficiently allege a claim against

Popoola, so the Court must deny default judgment at this time. Finally, because there is just reason

to permit Arinze to return to the case in place of Maxify, the Court grants the motion to vacate the

dismissal of Arinze, dismisses Maxify from this case, denies as moot the motion for entry of default

against Maxify, and once again strikes Maxify's motion for extension of time to find counsel.

**BACKGROUND**

I.       **Factual Background[1]**

    a.   ***The Preserve and Rehabilitate Program***

In 2018, the City of St. Louis passed Ordinance 70794, which created the Preserve and Rehabilitate Program. Doc. 1 ¶¶ 23, 27. Under the program, City officials have "the authority to require any violator of [the City building code] to correct, remove, or abate any condition caused or permitted by them in violation of [the] code," with the Building Commissioner empowered to "correct . . . [a violator's] failure to comply" by contracting out repairs to correct the violations "[f]or all emergency condemned buildings or structures." *Id.* ¶ 27. The contracts are paid from a public fund, but the costs are recouped by placing a lien on the offending property and assessing a "special tax bill." *Id.* The debt may be forgiven by the City Counselor. *Id.*

The City must provide the building owner a "Notice of Condemnation" before it can undertake any of the aforementioned actions.[2] ST. LOUIS, MO., Ordinance No. 70794 § 119.1 (May 11, 2018). This notice is sent to the owner "recorded most recently in the City of Saint Louis Assessor's Office" and must identify the "defects found . . . and order them to proceed to properly demolish, repair and secure, or correct all conditions causing condemnation of said building . . . within seven days." *Id.* If the owner fails to timely abate the condition, the building is condemned. *Id.* The notice of condemnation can be directly delivered to the owner, posted on the building, mailed to the owner's place of business or last recorded address, or published in a newspaper of general circulation. *Id.* § 119.2. The owner may appeal the decision to condemn the building "to the Board of Building Appeals within ten calendar days of the date on the Notice of Condemnation." *Id.* § 119.8. Any decision by the Board is "subject to the procedures and review provided by" Missouri's Administrative Procedures and Review Act. *Id.*

---

[1] As required at this stage, the Court accepts as true the well-pled facts from the Complaint. *See* Doc. 1; *infra* at 7–8.

[2] Defendants ask the Court to take judicial notice of the entirety of Ordinance No. 70794, which includes provisions not provided by Plaintiffs. *See* Doc. 56 at 12 n.3. The Court may take notice of legislative materials, *see Carpentier v. Mitchell Sch. Dist.*, 2024 WL 3599134, at *3 n.6 (D.S.D. July 31, 2024), and does so here.

### b.  *Affected Property Owners*

Various entities and individuals were adversely impacted by the Preserve and Rehabilitate Program, including Plaintiffs JAG4, LLC; Titsworth Properties, LLC; Unified Collective Urban Redevelopment Group, LLC; Jason LeRoy Staten; Anthony Pitale; and Veronica Erb (collectively, "Property Owners").[3] Each Property Owner brings a variety of claims against a mishmash of Defendants: the City of St. Louis; former Mayor Tishaura Jones; Building Commissioners Frank Oswald and Ed Ware; Building Inspectors John Watson, Adebanjo Popoola, Anthony Morrow, and Scott Lind; Maxify Contractors, LLC; and Farst Construction, LLC.

*JAG4*: The company has owned its property in the City since 2015. Doc. 1 ¶¶ 28–29. After 6 years, JAG4 opted to "gut[] out the building's interior," leaving it without plumbing, heat, water, and electric, but it is otherwise secured and structurally sound. *Id.* ¶¶ 31–35. JAG4 did not make further repairs because it was not economically viable. *Id.* ¶¶ 36–37. In November 2023, JAG4 received a Notice of Condemnation signed by Watson. The company disagreed with the purported building code violations but did nothing for 6 months, and it received notice that the City would perform overpriced and unnecessary work. *Id.* ¶ 40–48. By then, JAG4 had only 2 days left to appeal—which it did—but failed to convince the Board to reverse the decision. *Id.* ¶¶ 49–56. Instead, JAG4 prepared its own schedule of work to be done, presented the plan to Watson and Popoola, and began working on the listed repairs. *Id.* ¶¶ 57–60. JAG4 ran out of funds and stopped the work, but the City never followed up with an inspection, placed a tax lien on the property, or otherwise contacted JAG4. *Id.* ¶¶ 63–65, 69–71. JAG4's property is "no longer a useful asset" due to the cost of repairs it would not have made "but for the demands of the City." *Id.* ¶¶ 66–68.

---

[3] For the LLC Plaintiffs, the Complaint flips between referring to the LLCs and the sole owners of these companies, which actually owns the relevant properties. For clarity, the Court generally refers to the allegations made by the non-party company owners as if they were made by the particular Plaintiff.

3

***Titsworth***: In 2006, Titsworth bought a property with several structurally sound and generally secured buildings (though one lacks basic utilities). *Id.* ¶¶ 76–80. In 2019, Titsworth was sent a Notice of Condemnation falsely indicating that the property was unsafe, but the zip code on the notice envelope was wrong, and Titsworth does not recall receiving it. *Id.* ¶¶ 83–86. In March 2023, the City sent a Notice of Intent to Preserve and Rehabilitate Structure to a property previously owned by Titsworth. *Id.* ¶ 87–93. The next month, Titsworth drove past the property and saw workers "looking" at the building. *Id.* ¶ 94. The workers left after Titsworth told them to, but they later returned and started gutting the building. *Id.* ¶¶ 95–96. Titsworth again told them to leave. *Id.* ¶ 97. This time, the workers told Titsworth to call City Hall. *Id.* ¶¶ 98–100. Titsworth was informed of the notices and told to call Popoola, who told him to call another City employee who did not respond. *Id.* ¶¶ 102–08. Titsworth obtained a TRO to prevent any further work by the City, but it was dissolved in early November 2023 after Titsworth obtained the permits to perform the work itself. *Id.* ¶¶ 109–15, 119–20. In January 2024, before Titsworth commenced work, "workers on inference under the management and control of [Popoola] and/or the City, began doing work at the building." *Id.* ¶ 121. Popoola later told Titsworth there would be a letter stating how much was owed for the work and that the payment would be due within a year. *Id.* ¶¶ 126, 131. In October 2024, Ware sent a letter indicating that Titsworth owed a "special tax bill" of nearly $250,000—an amount well above the fair market value of the work. *Id.* ¶¶ 132–33, 139–40. Titsworth has not paid the bill, but no tax lien has appeared on the property. *Id.* ¶¶ 140, 143.

***Unified***: In 2021, Unified purchased its property, which was secured but "in very poor condition" and lacked basic utilities. *Id.* ¶¶ 147–51. Unified received notice 2 years later indicating that a permit had been taken out by Maxify—a construction company organized by Arinze—even though Unified did not apply for a permit. *Id.* ¶¶ 154–57. Unified's owner went to the property that day and saw workers, who she told to leave. *Id.* ¶¶ 158–61. She then spoke to Arinze, who denied an accusation that she knew Popoola and told the owner that she was hired by the City to

4

do the work. *Id.* ¶¶ 162–68. Unified's owner called the police, but after officers spoke to Arinze and unnamed City officials, they told the owner the workers had the right to be there and that she would be arrested if she did not leave. *Id.* ¶¶ 169–72. After attempting to speak with City officials, the owner was told to call Popoola. *Id.* ¶¶ 174–78. Popoola eventually got paperwork to Unified, including the Notice of Condemnation signed by Scott Lind and a Notice of Intent to Preserve and Rehabilitate Structure, both dated in Spring of 2023 but sent to Unified's old address. *Id.* ¶¶ 179–86. Some of the listed defects were present, but others were not. *Id.* ¶¶ 187–89. Unified did nothing until it inquired about an appeal a year later, which was too late. *Id.* ¶¶ 190–94. The City placed a tax lien on Unified's property for approximately $175,000. *Id.* ¶ 196.

**_Staten_**: Staten owned his property since 2009. *Id.* ¶ 202. Initially his family's residence, Staten now uses the building for storage, and it lacks water, heat, and electric. *Id.* ¶¶ 201–05. Though he tried to keep the house in good condition, vandals destroyed some of the building, and the theft of bricks made the house structurally unsound. *Id.* ¶¶ 207–14. In early 2023, the City pulled a permit in Staten's name to do work on the property, and later that year, workers started removing personal property.[4] *Id.* ¶¶ 217, 220. Staten told the workers to stop but was informed by an unnamed woman and the police that he no longer owned the property and was ordered to leave. *Id.* ¶¶ 225, 228–30. At some point, Staten went to City Hall and spoke to Popoola, who told him that a notice was left at the property and that Popoola was contracted to do the work. *Id.* ¶¶ 233–37. While some repair work was effective, the front entry and locks were damaged, and the roof repairs created drainage issues. *Id.* ¶¶ 246–50. Even with the repairs, the property is currently "not habitable." *Id.* ¶ 251. In 2024, Oswald sent a letter to the comptroller to certify that a $101,200 invoice should be assessed against the home, much more than the fair market value of the work. *Id.* ¶¶ 254–56. Staten was given a real estate tax bill for the amount, but he has not paid it. *Id.* ¶¶ 261–64.

---

[4] Between the issuance of the permit and this work, Staten pled guilty to housing code violations and was fined. *Id.* ¶ 252.

***Pitale and Erb***: The couple purchased a commercial property in 2024. *Id.* ¶¶ 273–74. Prior to closing, they learned that permits were pulled in the name of the seller but received assurances that the seller knew of no liens. *Id.* ¶¶ 277, 281. As it turns out, the seller was sent Notices of Condemnation and Intent to Preserve and Rehabilitate in 2023. *Id.* ¶¶ 311–12. Six days after closing, Pitale and Erb learned the property had been "stabilized," and they later received a tax bill for more than $109,000 in work. *Id.* ¶¶ 289–90. After discussions, including an examination of the repairs that had already been done, Pitale and Erb rebuffed settlement offers to reduce the tax bill. *Id.* ¶¶ 291–93, 295–301. The work was performed by Farst, a corporation that has its mail sent to Popoola's wife. *Id.* ¶¶ 302–05. In November 2024, Pitale and Erb received a Notice of Condemnation,[5] signed by Morrow, listing the same violations as noted in the tax bill. *Id.* ¶¶ 306–07.

## II.    Procedural Background

The Property Owners jointly filed a single lawsuit with the Complaint alleging the facts listed above. Collectively, they bring five claims: denial of substantive due process, civil conspiracy, a Fourth Amendment seizure against real property, denial of procedural due process, and "*Monell*." Doc. 1 at ¶¶ 361–92. Defendants Farst and Arinze were never served and were voluntarily dismissed. Docs. 63, 67. Maxify, a company, was served and attempted to answer through Arinze, Docs. 9, 11, but the Court struck the answer because a company cannot proceed pro se, Doc. 64. The Property Owners subsequently moved to vacate the prior dismissal of Arinze and substitute her for Maxify, while alternatively moving for default against Maxify. Docs. 81–82. Popoola was served by alternative service, Doc. 54, and the Clerk entered default against him after he failed to timely respond, Doc. 68. The Property Owners have since moved for default judgment against Popoola. Doc. 76.

---

[5] Notably, Plaintiffs do not specify the date that the Notice of Condemnation was issued. It is unclear, therefore, if this was a second Notice of Condemnation or the same one issued in 2023.

Defendants Jones, Watson, Morrow, Lind, Oswald, Ware (collectively, "City Officials") and the City appeared and filed motions to dismiss. Docs. 39, 43, 48, 49, 50, 73. To some degree, each of the City Officials seek dismissal because the Property Owners did not sufficiently plead that they violated a clearly established right through their individual conduct. *See, e.g.*, Doc. 49-1 at 4. The City seeks dismissal because there is no allegation of an official policy, custom, or practice to impute liability to it. Doc. 43-1 at 2. The Property Owners opposed these motions, Docs. 52, 78, including a broader argument that the case should proceed to discovery even if the Complaint fails to state a claim as written, Doc. 52 at 3–4, 15. After timely replies, Docs. 56, 83, the matter is now ripe for review.

## LEGAL STANDARD

### I.       Motion to Dismiss

A defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). The purpose of such motions "is to test the legal sufficiency of the complaint." *Ford v. R.J. Reynolds Tobacco Co.*, 553 F. Supp. 3d 693, 697 (E.D. Mo. 2021). To survive a Rule 12(b)(6) motion, the complaint must include "a short and plain statement of the claim showing that the [plaintiff] is entitled to relief" and provide notice of the grounds on which the claim rests. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quotation omitted). Additionally, the complaint must include sufficient detail to make a claim "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted). While "[s]pecific facts are not necessary," the plaintiff must include "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." *Delker v. MasterCard Int'l*, 21 F.4th 1019, 1024 (8th Cir. 2022) (quotations omitted). The question is not whether the plaintiff will ultimately prevail, but whether the plaintiff is entitled to present evidence in support of the claim. *Id.*

7

At the motion-to-dismiss stage, the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor. *See Brokken v. Hennepin Cnty.*, 140 F.4th 445, 450 (8th Cir. 2025) (citation omitted). But the Court does not "presume the truth of legal conclusions." *Jones v. City of St. Louis*, 104 F.4th 1043, 1046 (8th Cir. 2024) (citation omitted); *see also Kulkay v. Roy*, 847 F.3d 637, 641 (8th Cir. 2017) ("[T]he court is free to ignore legal conclusions, unsupported conclusions, unwarranted inferences and sweeping legal conclusions cast in the form of factual allegations."). Ultimately, this analysis is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

## II.     Default Judgment

A court may enter default judgment against a party who fails to litigate an action. FED. R. CIV. P. 55(b). Obtaining default judgment is a two-step process. First, the movant must obtain an entry of default, which the Clerk of Court must enter "[w]hen a party against whom a judgment . . . is sought has failed to plead or otherwise defend." *Id.* 55(a). Following the entry of default, the movant may apply to the Clerk of the Court for entry of default judgment under limited circumstances. *Id.* 55(b)(1). Otherwise, the movant must apply to the Court for default judgment. *Id.* 55(b)(2). In considering such applications, the Court deems the defaulting party to have admitted all well-pleaded factual allegations in the complaint. *Murray v. Lene*, 595 F.3d 868, 871 (8th Cir. 2010). But a defaulting party "does not admit mere conclusions of law," and the Court still must "consider whether the unchallenged facts constitute a legitimate cause of action." *Id.* (citation omitted). While the Court has discretion to grant a meritorious application, default judgments are strongly disfavored. *U.S. ex rel Time Equip. Rental & Sales v. Harre*, 983 F.2d 128, 130 (8th Cir. 1993).

**DISCUSSION**

While the Complaint identifies some potentially troubling issues with the Preserve and Rehabilitate Program, it is not a model of clarity in terms of specifics. Bordering on a shotgun-style pleading, it does little to put these particular Defendants—or the Court—on notice of what specific rights are at issue and what specific conduct each of the individual Defendants committed. As a result, even when read charitably, the Complaint fails to sufficiently allege a violation of any the Property Owners' due-process or Fourth Amendment rights by any Defendant, including Popoola. Without an underlying constitutional violation, there can be no conspiracy to deprive the Property Owners of their civil rights or liability against the City. The Court will explain each point in turn, before briefly addressing two other case-management issues.

I.      **Count I: Substantive Due Process**

The Property Owners first allege a violation of their substantive due process rights. The City Officials attack this claim first by arguing that the Property Owners have failed to state a substantive due process right, either because this count is "subsumed in their Fourth Amendment claims," *see, e.g.*, Doc. 39-1 at 4–5, or because "Plaintiff[s] cannot show that their interest in being free from the creation of a special tax bill is a liberty interest" protected by the Fourteenth Amendment's Due Process Clause, Doc. 74 at 7. With no established fundamental right, the City Officials also claim they are entitled to qualified immunity. *See, e.g.*, *id.* at 7–8.

The Complaint does not specify the fundamental interest at issue, but the Property Owners believe their allegation that "[t]he conduct of all Defendants herein shocks the conscience or interferes with rights implicit in the concept of ordered liberty" is enough to survive a motion to dismiss. Doc. 52 at 12 (implicitly citing Doc. 1 ¶ 336). Further, the Property Owners responded to most of the City Officials' arguments by stating that "[t]he court should conclude that [Lind, Morrow, and Watson] did not act in [a] constitutional manner" because their "statement[s] w[ere]

9

filled with lies and [they] condemned a property without reason." *See id.* at 14–15.[6] Finally, in their brief in response to Ware and Oswald, the Property Owners assert that "[t]he fundamental right at stake here is the right to fairness in government proceedings." Doc. 78 at 10 (citation omitted). That right, Ware and Oswald argue, is "defined at such a high level of generality" that the Court cannot find that it was clearly established at the time of the conduct. Doc. 83 at 6 (quotation omitted).

"To establish a substantive due process violation, [the plaintiff] must demonstrate that a fundamental right was violated and that [the defendant's] conduct shocks the conscience." *Kingsley v. Lawrence Cnty.*, 964 F.3d 690, 700 (8th Cir. 2020). Any asserted fundamental right must be "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1017 (8th Cir. 2012) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)). Any substantive due process analysis requires a court to "first consider whether the claimant has a protected property interest to which the Fourteenth Amendment's due process protection applies." *Ellis v. City of Yankton*, 69 F.3d 915, 917 (8th Cir. 1995) "Protected property interests are created by state law, but federal law determines whether the interest rises to the level of a constitutionally-protected property interest." *Id.* However, when "a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims." *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (quotations omitted).

The Property Owners' substantive due process claim fails because they have not shown an established fundamental right that was violated. The only purported right they identify is "[t]he fundamental right . . . to fairness in government proceedings." Doc. 78 at 10 (citing *Vaughn v.*

---

[6] In fact, that is effectively Plaintiffs' response to all constitutional violations against Lind, Morrow, and Watson.

*Performance Labs*, No. 1:24-CV-138-SNLJ, 2025 WL 1445357, at \*5 (E.D. Mo. May 20, 2025)). However, the fundamental right at issue in *Vaughn* was the right to child custody and visitation. 2025 WL 1445357, at \*5. The Property Owners have failed to provide—and the Court could not find—a case that clearly establishes a substantive due process right to fairness in government proceedings. Nor would the Court be inclined to extend this doctrine to include such a right, considering that any qualms about the fairness of a process invoke procedural, rather than substantive, due process guarantees. *See Potter v. Tontitown*, 2007 WL 9728823, at \*4 (W.D. Ark. Aug. 13, 2007) ("The Due Process Clause provides the familiar guarantee of fair procedures, . . . [while the] substantive component of the Due Process Clause protects individual liberty against certain government actions regardless of the fairness of the procedures used . . . ." (quotations omitted)). Moreover, as substantive due process requires "a careful description of the right asserted," *301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1385 (8th Cir. 2022) (quotation omitted), the Court will not strain to read the Property Owners' other generalized statements as asserting a fundamental interest. Because the Property Owners have not presented a single case establishing the fundamental right the Property Owners assert, the Court must dismiss this claim as to the City Officials and deny default judgment against Popoola.

## II.     Count IV: Procedural Due Process

The Property Owners also assert that their procedural due process rights were violated—with each Plaintiff naming the City[7] and Popoola, while JAG4, Unified, and Pitale and Erb also advance a claim against Watson, Lind, and Morrow, respectively. Further, the Complaint alleges that Jones, Oswald, and Ware violated the due process rights of unspecified Plaintiffs. These allegations are insufficient to state a claim against any Defendant.

---

[7] The Court will address the allegations against the City in the *Monell* section of this opinion.

The City Officials launch a bevy of challenges to the Property Owners' claims. The City Officials primarily assert qualified immunity because none of them can be shown to have violated a clearly established constitutional right through their own personal conduct. Doc. 39-1 at 9; Doc. 48-1 at 11; Doc. 49-1 at 11; Doc. 50-1 at 10; Doc. 74 at 13. In response, the Property Owners aver that the "Defendants failed to give [them] either notice or hearing regarding the work being done at their property, and/or gave [them] notice of deficiencies at their property which were materially false," but they do not otherwise specify the particular property right at issue or how any Defendant deprived the relevant Property Owner of the rights asserted. Doc. 52 at 6. For Lind, Morrow, and Watson, the Property Owners argue that the Court should find "that [they] did not act in [a] constitutional manner" because the Notices of Condemnation or Intent to Preserve and Rehabilitate Structure were "filled with lies" and each of the trio "condemned a property without reason." Doc. 52 at 13–15. The Property Owners also contend that Ware and Oswald are liable because they "affix[ed] their names to letter[s] to the Comptroller," "fail[ing] to give Plaintiffs either notice or hearing regarding the work being done at their property, and/or g[iving] Plaintiffs notice of deficiencies at their property which were materially false." Doc. 78 at 13–14. However, they do withdraw their procedural claims against Jones. Doc. 52 at 11–12. In reply, the City Officials aptly point out that the Property Owners did not respond to the building inspectors' invocation of qualified immunity, Doc. 56 at 6–7, nor did they state how the building commissioners' own conduct violated a clearly established constitutional right, Doc. 83 at 7.

To plead a procedural due process claim, a plaintiff must show that (1) they were deprived of a "life, liberty, or property interest" and (2) the interest was deprived of "without sufficient process." *Clark v. Kan. City Mo. Sch. Dist.*, 375 F.3d 698, 701 (8th Cir. 2004) (citation omitted). "In general, property interests are created by state law, not by the United States Constitution." *Sagehorn v. Indep. Sch. Dist. No 728*, 122 F. Supp. 3d 842, 863 (D. Minn. 2015) (citation omitted). If a plaintiff fails to establish a constitutionally protected property interest, there is no procedural due process claim. *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011).

12

The claims against Watson, Lind, and Morrow fail because the respective Property Owners have not identified the relevant property interest. The Property Owners were alerted to this shortcoming, *see, e.g.*, Doc. 50-1 at 6, but they never clearly responded. Ostensibly, the deprivation has something to do with "the work being done at their property," Doc. 1 ¶ 374; Doc. 52 at 6, but the Property Owners must clearly state what property interest Watson, Lind, or Morrow violated and how—not least of all because they have invoked qualified immunity. The three building inspectors are shielded from suit unless existing caselaw "placed the statutory or constitutional question beyond debate," such that the contours of the right are "so well defined that it is clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Shrouf v. Adair Cnty.*, No. 2:22-CV-91-JMB, 2023 WL 3002420, at *3 (E.D. Mo. April 19, 2023) (citations omitted). The doctrine also requires "an individualized analysis of each [official's] alleged conduct." *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013). The Property Owners' general statement that "[t]he [C]ourt should conclude that [Watson, Lind, or] Morrow did not act in [a] constitutional manner," Doc. 52 at 15, does not suffice to identify the protected property interest.[8] As such, the Court dismisses this claim against these three Defendants.[9]

---

[8] The Property Owners ask the Court to permit them to proceed to discovery if it "concludes that at this phase [the Complaint] does not have sufficient facts to defeat qualified immunity." Doc. 52 at 15. For support, they cite the recent Eighth Circuit cases of *Murphy v. Schmitt*, 143 F.4th 914 (8th Cir. 2025), and *Troupe v. Young*, 143 F.4th 955 (8th Cir. 2025), to suggest that the Court should "read[] liberally" the pleading requirement to survive a motion to dismiss. *Id.* at 3–4. But these cases are not so broad. *Murphy* dealt with the need to put forth objective evidence of selective enforcement for certain First Amendment retaliation claims where the objective evidence of non-enforcement is almost exclusively in the control of the defendants. 143 F.4th at 919. And *Troupe* dealt with the deference a court must give to allegations pled "on information and belief," 143 F.4th at 967, which is not relevant here. Instead, the Property Owners fail to articulate the constitutional right at issue. That information is almost exclusively in their hands, as they should be aware of which of their constitutional rights were violated. The Property Owners are still required to put the Defendants on notice of the constitutional violation at issue, and neither *Murphy* nor *Troupe* say otherwise.

[9] Another deficiency identified by the City Officials is that the Property Owners failed to exhaust available state remedies. *See* Doc. 48-1 at 12–13. As Eighth Circuit precedent has made clear, a plaintiff must exhaust the available remedies to bring a procedural due process claim. *Doe v. Univ. of Neb.*, 451 F.Supp.3d 1062, 116 n.46 (D. Neb. 2020) (collecting cases). That said, a plaintiff is not required to "exhaust[] available *postdeprivation* remedies when the litigant contends that he was entitled to *predeprivation* process." *Id.* (citing *Keating v. Neb. Pub. Power Dist.*, 592 F.3d 923, 929 (8th Cir. 2009). Exhaustion may be important to confront for some of the Property Owners, such as JAG4, because their allegations concern a failed appeal. For now, though, that issue does not need to be addressed further.

Likewise, the procedural due process claims against Jones, Oswald, and Ware must be dismissed. For Jones, the Property Owners admit that they have "no evidence of [] personal involvement in Plaintiffs' individual situations" and thus seek to dismiss the claim at this time. Doc. 52 at 12. As such, the Court dismisses the procedural due process claim against Jones as withdrawn. For Oswald and Ware, the Property Owners merely state that the relevant party is "[t]o be determined in discovery." Doc. 1 ¶ 374. In other words, no named Plaintiff actually brings a specific claim against either of these Defendants for a procedural due process violation. While the Property Owners suggest that Oswald and Ware are liable to some unspecified Plaintiff[10] because they "affix[ed] their names to letters to the Comptroller," Doc. 78 at 14, that does not rectify the deficiency of the Complaint. A complaint must be written in a way to "give fair notice of the alleged claims, meaning that a plaintiff must provide sufficient notice that she is seeking relief or making a claim on the cause of action alleged against the defendant." *Treib v. Glatt*, 2010 WL 5068075, at *4 (D.S.D. Dec. 7, 2010) (citation omitted). If what the Property Owners claim is true, then they need to put Oswald and Ware on notice of which Plaintiff is asserting this claim against them. But the Court will not speculate who that person is, nor will it require Oswald and Ware to do so. As such, Count IV is dismissed against each Defendant.

Finally, even accepting the facts in the Complaint, the Court cannot enter default judgment against Popoola on this record. As an initial matter, the Complaint again leaves the Court guessing as to what property interest the Property Owners were deprived of by Popoola. But even if there

---

[10] Titsworth and Staten allege that Ware and Oswald respectively wrote letters to the Comptroller regarding the costs incurred in repairing the property. *See* Doc. 1 ¶¶ 132–34, 255–57. While those factual allegations are helpful, they do not make it clear what relevance that has to the procedural due process claim. The Property Owners brought other claims against Ware and Oswald, s*ee id.* ¶¶ 361–68, but did not specify if writing those letters are factual allegations supporting this claim or the others. Further, the other claims are listed as "against all defendants," and it suggests that every Plaintiff is bringing the claim against Ware and Oswald. Thus, stating that the Plaintiff bringing a procedural due process claim is "to be determined" suggests that this is a shotgun-style allegation. Plaintiffs need to be clear who is bringing the allegation against Ware and Oswald.

14

were a defined property interest, the Complaint fails to allege how Popoola deprived the Propoerty Owners of the opportunity for a notice or hearing. Titsworth and Staten state that Popoola was involved in their actions only after another a building inspector signed a Notice of Condemnation or Notice of Intent to Preserve and Rehabilitate. *See* Doc. 1 ¶¶ 83, 106–07, 235. Unified pled only that Popoola sent it the previously issued Notice of Condemnation, which was signed prior to the workers starting on its property. *Id.* ¶¶ 158, 179–84. Pitale and Erb do not state any facts about Popoola, other than that he "is married to or at one time was married to the person in St. Louis who was receiving mail for Farst." *Id.* ¶ 304. And JAG4 merely alleges that Popoola was present at the hearing it was given but fails to indicate that Popoola did anything at the hearing. *Id.* ¶¶ 51–57. Without more, the allegations are insufficient to state a procedural due process claim against Popoola. As such, the Court must deny default judgment as to Popoola at this time.[11]

### III.    Count III: Fourth Amendment Seizure of Real Property

Next, the Property Owners allege that their property was unlawfully seized. All Property Owners bring a seizure claim against Popoola, while JAG4, Unified, and Pitale and Erb also allege a seizure by Watson, Lind, and Morrow, respectively. Watson argues that JAG4 fails to state a claim because his personal conduct did not cause a seizure and, more importantly, JAG4 failed to even plead that its property was seized. Doc. 48-1 at 10. Lind and Morrow each contend that merely signing a notice is insufficient to show that their conduct interfered with the Property Owners' possessory interests. Doc. 49-1 at 10–11; Doc 50-1 at 9–10. As with their procedural due process claim, the Property Owners merely restate their Complaint and ask the Court to find that the Watson, Lind, and Morrow "did not act in [a] constitutional manner." Doc. 52 at 13–15.

---

[11] As a final point, Plaintiffs cite *Pesce v. City of Des Moines*, 439 F. Supp. 3d 1101, 1123 (S.D. Iowa 2020), and *Mulvenon v. Greenwood*, 643 F.3d 653, 657 (8th Cir. 2011), to support their claim without explanation. *See* Doc. 52 at 6–7. But neither case is availing. Although *Pesce* involved a notice that contained "false information," the case is easily distinguishable because the false statements were about the opportunity to be heard. 439 F. Supp. 3d at 1123. The false statements here are about the nature of the work to be done, which does not itself affect the opportunity to challenge those falsehoods. And *Mulvenon* actually cuts against the Property Owners, as that case stands for the proposition that procedural safeguards do not by themselves create a property interest. 643 F.3d at 658–59. As such, Plaintiffs do not offer concrete support for their allegations in the Complaint as written.

"To establish a violation of the Fourth Amendment in a section 1983 action, the claimant must demonstrate a seizure occurred and the seizure was unreasonable." *McCoy v. City of Monticello*, 342 F.3d 842, 846 (8th Cir. 2003) (abrogated on other grounds). Under the Fourth Amendment, property is seized "when there is some meaningful interference with a person's *possessory* interests in that property." *Andrews v. City of West Beach*, 454 F.3d 914, 918 (8th Cir. 2006) (citation omitted). Not all interferences will suffice; "the seizure standard prohibits the government's conversion of an individual's private property, as opposed to the mere technical trespass to an individual's private property." *United States v. Va Lerie*, 424 F.3d 694, 702 (8th Cir. 2005).

Here, the Fourth Amendment claims do not survive the motion to dismiss. Broadly speaking, the Complaint highlights—at a minimum—gross mismanagement under the Preserve and Rehabilitate Program. But when focusing specifically on the purported conduct of each named Defendant, there is not enough to state a claim.

First, JAG4 fails to plead that its property was seized by Watson or anyone else. At no point does JAG4 assert that anyone took possession of its property or that Watson himself did anything to directly interfere with its property interests. Instead, JAG4 merely alleges that a notice was issued, it performed work on its own property, and the City never followed up even after the work was not completed. Doc. 1 ¶¶ 40–71. It is not apparent to the Court how those circumstances alone show how Watson—or anyone—meaningfully interfered with JAG4's possessory interest in its property. Thus, JAG4 failed to plead a seizure of its property.

Similarly, Pitale and Erb fail to plead that Morrow seized their property. At best, the couple allege that someone took possession of the property from the previous owners. But the Complaint does not allow the Court to infer that *Morrow* meaningfully interfered with Pitale and Erb's property when *they* had a possessory interest in it. Specifically, the Complaint states that the

16

property was "'[s]o ordered' by Anthony Morrow" to be condemned, but it does not state when the notice was issued. *Id.* ¶ 307. Given that the repairs were apparently made before the couple purchased the property, *see id.* ¶¶ 277–78, 284, and that the condemnation had to precede the work, the only reasonable interpretation is that, in November 2024, the couple received a duplicate notice of the one issued in 2023, when the previous owners possessed the property. *Id.* ¶¶ 289, 311–13. And while Pitale and Erb state that they received a tax bill for "needed repairs," *id.* ¶¶ 289–91, the Preserve and Rehabilitate Program allows for the retrospective collection for repairs, not the prospective billing for needed repairs. *See* ST. LOUIS, MO., Ordinance No. 70794 § 119.5 (May 11, 2018). The bill would relate only to past work done on the property, not future demands. Thus, even assuming that Morrow issued a second Notice of Condemnation, it is not clear how that notice itself constitutes a seizure, as it informs the owner of their responsibility to abate the conditions identified. *See id.* § 119.1. As such, the Court cannot conclude that Morrow's order itself meaningfully interfered with Pitale and Erb's possessory interests based on this Complaint.

Unified's claim against Lind likewise fails. Here, Unified alleges that Lind signed a Notice of Condemnation prior to the work commencing on the property. *See id.* ¶¶ 184–85. But that does not explain how Lind's conduct unreasonably interfered with Unified's possessory interests. Unified alleges that "[t]he seizure of Unified's building [occurred] by Defendants entering onto it and working on it." *Id.* ¶ 199. But the company did not allege Lind entered or worked on the property, just that he signed a Notice of Condemnation. *Id.* ¶ 185. In response, Lind argues that signing the notice was not enough to allege that a Fourth Amendment seizure occurred as a result of his conduct, meaning he was entitled to qualified immunity. *See* Doc. 50-1 at 9–10. As noted previously, Unified's only response was to say that Lind "did not act in a constitutional manner" and that he "condemned a property without reason." Doc. 52 at 15. But Unified itself provided the

reason for a condemnation, as it admits that some of the allegations in the Notice of Condemnation were accurate. Doc. 1 ¶ 188. And because a building is not automatically condemned through the issuance of a Notice of Condemnation, it is not clear that Lind's signing the notice resulted in the condemnation of the building. Further, by failing to include in the Complaint a logical thread between signing the notice and the entry of workers onto the property, Unified has not included enough to overcome Lind's argument that his actions did not meaningfully interfere with the asserted possessory interest: entering into and working on the property. *See* Doc. 1 ¶ 199. While Unified alleges its owner was removed from the property, that decision apparently was made by police officers and an unnamed city worker—not Lind. *See id.* ¶¶ 169–73. Thus, Unified fails to allege that Lind seized its property.

Nor do any Property Owners sufficiently establish that Popoola violated their Fourth Amendment rights. As noted above, JAG4 fails to establish that its property was seized by anyone—including Popoola. Pitale and Erb allege no facts about Popoola's individual conduct, mentioning his name in passing only once. *See id.* ¶ 304. And despite what is "kn[own] in [one's] heart," the only conduct Unified alleges against Popoola is that he sent paperwork to Unified after it called him. *Id.* ¶¶ 167, 178–81. Finally, while Titsworth and Staten's cases are closer, they too offer insufficient facts to show Popoola unreasonably seized the property. The Constitution prohibits only "*unreasonable* seizures, not unreasonable or ill-advised conduct in general," meaning that the Court "scrutinize[s] only the seizure itself, not the events leading to the seizure, for reasonableness under the Fourth Amendment." *Williams v. City of Burlington*, 516 F. Supp. 3d 851, 864 (S.D. Iowa 2021) (citation omitted) (emphasis added). Titsworth and Staten allege that the seizure of their buildings occurred when they were "enter[ed] and work[ed] on." Doc. 1 ¶¶ 145, 267. Even if Popoola's conduct of having his workers remain at their property to work on it

18

meaningfully interfered with their *possessory* interests in the building, the facts pled indicate that the seizure was reasonable. Even if there were issues with the underlying notices or the way the contracts were obtained, Popoola was contracted to do the work. Doc. 1 ¶¶ 142, 236. While other actors may have acted unreasonably leading up to the execution of the contracts, the Complaint does not make clear how Popoola's actions of executing on those contracts was itself unreasonable. Looking at the apparent seizure in the moment, and as pled in this Complaint, the allegations are insufficient to state that Popoola acted unreasonably with respect to the seizure of Titsworth or Staten's buildings.[12] As such, the Court must deny default judgment at this time.

None of the above is to say that the Property Owners have no viable seizure claims or other potential constitutional challenges. The Complaint describes misdeeds by at least some actors. But a complaint requires "a short and plain statement of the claim showing that the pleader is entitled to relief," and "[e]ach allegation must be simple, concise, and direct." FED. R. CIV. P. 8(a)(2), (d)(1). As written, this Complaint does not fit the bill.

## IV.    Count II: Civil Conspiracy

Next, there is the Property Owners' claim of conspiracy to deprive them of their civil rights. Beyond the potential issues regarding the intercorporate conspiracy doctrine and a possible failure to plead that there was a meeting of the minds,[13] this claim fails because the underlying constitutional violations have been dismissed. And when there is no constitutional violation, "there is no actionable conspiracy claim" and this count "necessarily fails." *See Torgerson v. Robert Cnty.*,

---

[12] While the pair repeatedly claim that the cost of the work was unreasonable, that does not itself connect an unreasonable bill with an unreasonable seizure.

[13] Perhaps the best snapshot of the Complaint's deficiencies is the conflation of different Plaintiffs and their claims. For example, the Property Owners defended against the City Officials' invocation of the intra-corporate conspiracy defense with the claim that "non-government actors were involved: Defendants Maxify Contractors, LLC . . . and Ifeanyi Arinze." Doc. 52 at 5. But that would save only Unified's claim for conspiracy. No other Plaintiff alleged any facts regarding Maxify or Arinze's involvement in their claims. *See* Doc. 1 ¶¶ 28–146, 201–316. If Plaintiffs choose to amend their Complaint, they must be careful not to conflate the parties and claims again.

139 F.4th 638, 646 (8th Cir. 2025) (affirming a grant of summary judgment for defendants on a civil-conspiracy claim where no constitutional violation was asserted); *see also Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 809 (8th Cir. 1999) (affirming dismissal of a civil-conspiracy claim when all other section 1983 claims were dismissed "because a claim of civil conspiracy does not set forth an independent cause of action but rather is sustainable only after an underlying tort claim has been established"). As such, the Court must similarly dismiss the civil-conspiracy claim.

## V.    Count V: *Monell* Claims

Finally, the Property Owners assert municipal liability against the City under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). They allege four theories of *Monell* liability: failure to supervise, an unconstitutional custom, an unconstitutional policy through the passage of Ordinance 70794, and the "direct role of policy makers." Doc. 1 ¶¶ 377–92. However, the City cannot be held liable under the current Complaint. "Broadly, a local government can be held liable for a constitutional violation, . . . but it cannot be liable unless there was an unconstitutional act by one of its employees." *Smith v. Lisenbe*, 73 F.4th 596, 601 (8th Cir. 2023) (citations omitted); *see Braun v. Burke*, 983 F.3d 999, 1003–04 (8th Cir. 2020) (affirming dismissal of a *Monell* claim where qualified immunity was granted for the underlying constitutional violations). Because the Property Owners did not sufficiently plead an underlying constitutional violation by one of the City's employees, the Court dismisses the claims against the City.

## VI.    Maxify and Arinze

Turning to housekeeping, the Court takes up the Property Owners' motion to vacate its prior order dismissing Arinze. Doc. 81. A court may relieve a party from an order for any reason that justifies relief. FED. R. CIV. P. 60(b). "Rule 60(b) is to be given liberal construction so as to do substantial justice." *MIF Realty v. Rochester Assocs.*, 92 F.3d 752, 756 (8th Cir. 1996).

20

Here, the circumstances justify the relief. The Court's prior order was based on the Property Owners' indication that Arinze was difficult to serve and that, although she is liable, dismissal was justified because she "has filed nothing" and invested no resources in the case. Doc. 57 at ¶¶ 5–16. As it turns out, Arinze was acting pro se on behalf of Maxify, which she cannot do. *See* Doc. 64 at 2. The Property Owners served the motion for substitution on Arinze, Doc. 81 at 2, but Arinze never responded. Instead, she continues to file on behalf of Maxify motions for extension of time to secure counsel.[14] Docs. 77, 84. Thus, the Property Owners' realization that Arinze has been found, Arinze's inability to locate an attorney to represent Maxify, and the fact that Arinze has not objected to the motion all justify granting relief from the order dismissing Arinze with prejudice.

Further, the Court construes the Property Owners' request to replace Maxify as a conditional request for voluntary dismissal. "[A]n action may be dismissed at the plaintiff's request . . . by court order, on terms that the court considers proper." FED. R. CIV. P. 41(a)(2). As previously noted, an action includes all claims against a single defendant, even when a case is brought against multiple defendants. *See* Doc. 63 at 1–2. In considering a motion for voluntary dismissal, courts consider three factors: (1) "whether the party has presented a proper explanation for its desire to dismiss"; (2) "whether a dismissal would result in a waste of judicial time and effort"; and (3) "whether a dismissal will prejudice the defendants." *Blaes v. Johnson & Johnson*, 858 F.3d 508, 512 (8th Cir. 2017) (quotations omitted). All three factors favor dismissal. The Property Owners have sufficiently explained why Maxify should be replaced by Arinze. Further, judicial time and effort is not wasted as this case remains at an early stage, and the granted motion to dismiss clarifies the overall issues with this case. Finally, Maxify is not prejudiced because it cannot otherwise defend itself pro se, while Arinze may. As such, the Court also orders that Maxify be dismissed.

---

[14] Once again, Arinze filed a motion on behalf of Maxify for an extension of time. *See* Doc. 84. For the same reasons as stated in the previous order striking a similar motion, *see* Doc. 79, the Court once again strikes this motion.

**VII.    Leave to Amend**

As a final housekeeping matter, the Court will give Property Owners leave to amend the Complaint to cure the deficiencies identified above. In doing so, they should be mindful of the need to plead on an individual-by-individual basis, showing how a given Defendant's conduct violates a specific constitutional right or infringes upon a specific protected interest of an individual Property Owner. While multiple Property Owners may certainly allege claims against multiple Defendants, they must avoid shotgun-style pleading so as to apprise the Court and Defendants of the nature of the allegations. While Property Owners are free to plead as they see fit, it may be advisable to bring claims on a Plaintiff-by-Plaintiff basis as opposed to a claim-by-claim basis so as to avoid confusion. Additionally, while the deficiencies will require an amended complaint to contain additional allegations, the Property Owner should also be mindful of the requirement to provide "a short and plain statement of the claim showing that the pleader is entitled to relief," FED. R. CIV. P. 8(a)(2), which will require them to make their existing allegations tighter and more concise. Finally, any amended complaint must be filed **no later than April 21, 2026**.

**CONCLUSION**

Accordingly, the Court **GRANTS** Defendants' [39], [43], [48], [49], [50], and [73] motions to dismiss and dismisses without prejudice the claims against Defendants City of St. Louis, Tishaura Jones, Frank Oswald, Ed Ware, John Watson, Anthony Morrow, and Scott Lind. Plaintiffs are granted leave to file an amended complaint **no later than April 21, 2026**. Further, the Court **DENIES** without prejudice Plaintiffs' [76] motion for default judgment against Defendant Adebanjo Popoola and **DENIES** as moot Plaintiffs' [70] motion to defer entry of default judgment. The Court also **GRANTS** Plaintiffs' [81] motion to vacate the partial dismissal of Defendant Ifeanyi Arinze with prejudice and substitute Arinze for Defendant Maxify Contractors, LLC; **VACATES** its [63] Order of Partial Dismissal of Arinze; **DISMISSES** Maxify under Rule 41(b)(2); and

22

**DENIES** Plaintiffs' [82] Motion for Entry of the Clerk's Default Against Maxify as moot. Finally, the Court **STRIKES** Maxify's [84] Motion for Extension of Time to Find Representation.

So ordered this 31st day of March 2026.

ZACHARY M. BLUESTONE
UNITED STATES DISTRICT JUDGE

23